*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0388p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

FRANK G. SPISAK, JR.,

*Petitioner-Appellant,*

v.

No. 03-4034

BETTY MITCHELL, Warden,

*Respondent-Appellee.*

>

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 95-02675—Solomon Oliver, Jr., District Judge.

Argued: March 14, 2006

Decided and Filed: October 20, 2006

Before: MARTIN, MOORE, and CLAY, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Alan C. Rossman, Cleveland, Ohio, for Appellant. Carol Ann Ellensohn, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Alan C. Rossman, Cleveland, Ohio, Kreig J. Brusnahan, LAW OFFICES OF KREIG J. BRUSNAHAN, Avon Lake, Ohio, for Appellant. Carol Ann Ellensohn, Charles L. Wille, ATTORNEY GENERAL'S OFFICE OF OHIO, CAPITAL CRIMES SECTION, Columbus, Ohio, for Appellee.

CLAY, J., delivered the opinion of the court, in which MARTIN, J., joined. MOORE, J. (pp. 28-30), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

CLAY, Circuit Judge. This appeal is brought by death-sentenced Ohio prisoner, Frank G. Spisak, Jr., from the judgment of the district court dismissing Defendant's application for a § 2254 writ of habeas corpus. Defendant challenges his sentence and convictions on the following grounds: (I) that the trial court improperly struck the testimony and reports of expert witnesses and refused to submit Defendant's insanity defense to the jury; (II) his trial counsel rendered ineffective assistance during the mitigation phase of his trial; (III) the unanimity and "acquittal-first" jury instructions infringed Defendant's constitutional rights; (IV) there was a *Clemons* violation where the trial court upheld Defendant's death sentence after re-weighing the aggravating and mitigating

1

circumstances; and (V) that there was prosecutorial misconduct during various stages of the culpability and mitigation phases of the trial.

For the reasons set forth below, we **AFFIRM** in part and **REVERSE** in part. We **AFFIRM** the judgment of the district court as it relates to issues I, IV, and V, but we **REVERSE** the district court's judgment as to issues II and III, and **REMAND** with instructions to grant Defendant's petition as to these issues.

## BACKGROUND

### I.    Procedural History

On March 29, 1983, the Cuyahoga County Grand Jury indicted Defendant Spisak on four counts of aggravated murder in violation of Ohio Rev. Code § 2903.01; three counts of aggravated robbery in violation of Ohio Rev. Code § 2911.01; one count of attempted murder in violation of Ohio Rev. Code § 2903.02; and one count of receiving stolen property in violation of Ohio Rev. Code § 2913.51. Pursuant to Ohio Rev. Code § 2929.04(A), the aggravated murder counts contained nineteen death penalty specifications.

Defendant pled not guilty by reason of insanity, claiming to be a follower of Adolf Hitler, as to all counts on April 8, 1983. Before trial, the court ordered Defendant to be evaluated by Dr. Phillip Resnick ("Resnick"), to determine his competency to stand trial. Defendant also requested, and was granted psychiatric evaluations by four other psychiatrists: Dr. Sandra McPherson ("McPherson"), Dr. Kurt Bertschinger ("Bertschinger"), Dr. S.M. Samy ("Samy"), and Dr. Oscar Markey ("Markey"). Thereafter, the trial court held a competency hearing, wherein it was determined, based on Resnick's recommendation, that Defendant was competent to stand trial.

A jury convicted Defendant on July 27, 1983 of all counts and specifications, except for one of the aggravated robbery counts. After the mitigation phase of the trial, the jury recommended a sentence of death, which was accepted by the trial court, and Defendant was sentenced to death on August 10, 1983. Defendant was also sentenced to terms of seven to twenty-five years imprisonment on each attempted murder and aggravated robbery conviction.

Defendant timely appealed his convictions and sentence to the Ohio Court of Appeals for the Eighth District. The court found that Defendant was improperly convicted of two counts of aggravated murder for the death of Timothy Sheehan, and vacated one of the two convictions. The court affirmed the conviction and death sentence on the other aggravated murder charges, as well as the five specifications attached thereto, leaving Defendant with three aggravated murder convictions, and fifteen death penalty specifications. *State v. Spisak*, Nos. 47458, 47459, 1984 WL 13992 (Ohio Ct. App. 1984).

After a number of intervening appeals to the Eighth District Court of Appeals, and requests for remand to the Ohio Supreme Court, Defendant finally filed his merits brief with the Ohio Supreme Court on November 24, 1986, in which he raised sixty-four proposed errors of law. The Ohio Supreme Court issued an abbreviated opinion on April 13, 1988, affirming Defendant's convictions and sentence. *State v. Spisak*, 521 N.E.2d 800 (Ohio 1988).

Defendant then petitioned the U.S. Supreme Court for a writ of certiorari, but the petition was denied. *Spisak v. Ohio*, 489 U.S. 1071 (1989). Defendant spent the next six years filing and appealing denials of countless motions for post-conviction relief.

On December 15, 1995, Defendant filed a Notice of Intent to File a Petition for Writ of Habeas Corpus with this Court. Subsequent to filing the petition, Defendant filed a motion with this Court on June 13, 1997 to stay his execution, which was granted.

Defendant filed his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on April 9, 1997, raising thirty-three grounds for relief. The district court issued an Opinion and Order denying the petition on April 18, 2003, but the court granted Defendant a certificate of appealability as to thirteen of his claims. Defendant filed a Rule 59 motion to alter or amend judgment on July 29, 2003. In response to that motion, the district court granted an additional certificate of appealability as to one sub claim. Defendant timely appealed to this Court on July 31, 2003.

## II.      Factual History

In its rejection of Defendant's direct appeal, the Ohio Supreme Court set forth binding factual findings with respect to the overwhelming evidence adduced at Defendant's trial. Under 28 U.S.C. §2254(e)(1), Defendant has "the burden of rebutting the presumption of correctness by clear and convincing evidence." Defendant does not challenge these factual findings, so we adopt them below.

> On February 1, 1982, the body of the Reverend Horace T. Rickerson was discovered by a fellow student on the floor of a restroom on the Cleveland State University campus. Rickerson had been shot seven times by an assailant from a distance of more than eighteen inches. Four spent bullet casings were recovered from the scene.

> On the evening of June 4, 1982, John Hardaway was shot seven times while waiting for an RTA train at the West 117th Rapid Station in Cleveland. He observed a man walking up the platform steps and had turned away when the man opened fire on him. Hardaway survived the shooting, and was later able to identify his assailant as the appellant, Frank G. Spisak. Three pellets and seven shell casings were recovered from the scene.

> At approximately 5:00 p.m. on August 9, 1982, Coletta Dartt, an employee of Cleveland State University, left her office to use the restroom. Upon exiting the stall, she encountered the appellant, holding a gun, who ordered her back into the stall. Instead, Dartt shoved appellant out of the way and ran down the hallway. Appellant shot at her, but missed. A pellet was later removed from a wall in the hallway. Dartt identified the appellant as her assailant.

> On August 27, 1982, the body of Timothy Sheehan, an employee of Cleveland State University, was discovered in a restroom at the university by a security guard. The guard had been searching for Sheehan after his office reported that he had failed to answer his beeper page. Sheehan had been shot four times, and two pellets were retrieved from the scene.

> On the morning of August 30, 1982, the body of a young student, Brian Warford, was discovered in a bus shelter on the campus of Cleveland State University. Warford died from a single gunshot wound to the head, although five spent .22 caliber casings were recovered from the scene.

> On September 4, 1982, Cleveland police answered a call that a man was firing shots from a window at 1367 East 53rd Street. The police were directed to appellant's apartment and appellant, after admitting he had fired one shot, invited the officers inside. A shotgun and a .22 caliber automatic pistol were observed in the room. Appellant made a suspicious move toward the couch but was stopped by one of the officers who discovered a loaded .38 caliber handgun and a two-shot derringer under the couch cushions. Appellant was arrested for possession of unregistered handguns and discharging firearms within city limits, but was later released on bond. The weapons, however, were confiscated. Early the next day, an anonymous caller told

police that the confiscated weapons had been used in the Cleveland State University shootings. Ballistics tests confirmed the tip. A warrant was obtained, and the police returned to Spisak's apartment, confiscating several items including newspaper clippings of the homicides and Nazi-White Power paraphernalia. Appellant was later arrested, hiding in the basement of a friend's house. During a brief search of appellant's suitcase at the scene, police discovered the beeper pager belonging to Sheehan.

Appellant later admitted to shooting Rickerson for allegedly making a homosexual advance toward him; to killing Sheehan as a possible witness to the Rickerson shooting; to killing Warford while on a "hunting party" looking for a black person to kill; and finally, to shooting at Dartt and to shooting Hardaway. He also told police he had replaced the barrel of the .22 caliber handgun in order to conceal the murder weapon.

*Spisak*, 521 N.E.2d at 800-01.

## STANDARD OF REVIEW

In habeas appeals, we review the district court's legal conclusions *de novo* and the factual findings for clear error. *Jordan v. Hurley*, 397 F.3d 360, 362 (6th Cir. 2005). However, following the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State Court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim – resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the defendant's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 317-18 (6th Cir. 2001). For purposes of 28 U.S.C. § 2254 (d)(1), "clearly established law . . . 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision.'" *Yarborough v. Alvarado*, 541 U.S. 652, 660-61 (2004) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A state court decision can be "contrary to" "clearly established federal law" if it applies a rule that contradicts the governing law set forth in Supreme Court cases; or the state court decision confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams,* 529 U.S. at 405; *Bailey v. Mitchell*, 271 F.3d 652, 656 (6th Cir. 2001). The state court decision constitutes an "unreasonable application" of "clearly established federal law" where the state court identifies the correct governing legal rule from the Supreme Court's cases but unreasonably applies it to the facts of the particular state prisoner's case; or the state court either unreasonably extends a legal principle from a Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 407; *Bailey*, 271 F.3d at 655. A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 409.

AEDPA requires heightened respect for state court factual findings and legal determinations. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the Defendant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## DISCUSSION

### I.       Not Guilty By Reason of Insanity Defense

Defendant sought to present an insanity defense to the jury during the guilt phase of his trial, but the trial court disallowed the defense by: (1) striking the testimony of Defendant's expert, Markey; (2) refusing to allow any other experts to testify as to Defendant's sanity; and (3) refusing to instruct the jury as to an insanity defense. Defendant raised this issue on direct appeal to the Ohio Eighth District Court of Appeals, which found that the trial court did not err in striking Markey's testimony since it did little to alter the presumption that Defendant was sane, and was likely to have confused the jury on the issue. *Spisak*, 1984 WL 13992, at *5. The Eighth District Court of Appeals further found that Defendant was not entitled to a jury instruction on the insanity defense because Defendant had failed to meet his burden of going forward with evidence of legal insanity. *Id*. at *6. The Supreme Court of Ohio summarily affirmed the Court of Appeal's decision. *State v. Spisak*, 521 N.E.2d at 800. On habeas review, the district court agreed with the Eighth District Court of Appeals that Markey's testimony would not aid Defendant's insanity defense, and thus, that Defendant's constitutional rights were not violated by the exclusion of the testimony. The district court further found that Defendant was not entitled to a jury instruction on the defense. Defendant now appeals to this Court claiming that the district court erred in finding that Defendant was not denied a fair trial by the exclusion expert testimony and evidence related to Defendant's insanity defense, and that the trial court did not violate clearly established federal law in refusing to submit Defendant's insanity defense to the jury.

#### A.       *Exclusion of Expert Testimony and Evidence*

Defendant first argues that the district court infringed his fundamental right to a fair trial by striking the testimony of his expert, Markey, and by excluding testimony and evidence from other experts related to Defendant's insanity defense. While it cannot be disputed that Defendant has a fundamental right to a fair trial, we do not agree that this right was infringed by the state trial court's evidentiary ruling excluding what it considered to be irrelevant and potentially prejudicial expert evidence.

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations and quotations omitted). Having the opportunity to be heard is an essential component of procedural fairness. *Id*. Being allowed to present "relevant evidence is integral to that right." *Baze v. Parker*, 371 F.3d 310, 323 (6th Cir. 2004) (citing *Taylor v. Illinois*, 484 U.S. 400, 408-09 (1988) for the proposition that "[t]he need to develop all relevant facts in the adversary system is both fundamental and comprehensive").

Federal courts have long recognized, however, that "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (citations omitted). A defendant's interest in relevant evidence "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (citations omitted) ("In applying its evidentiary rules a State must evaluate whether the interests served by a rule justify the limitation imposed on the defendant's constitutional right to testify."). "As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge

an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer*, 523 U.S. at 308 (quoting *Rock*, 483 U.S. at 56).

The Supreme Court has, moreover, "found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." *Id*. (citing *Rock*, 483 U.S. at 56; *Chambers*, 410 U.S. at 302; *Washington v. Texas*, 388 U.S. 14, 22-23 (1967)). "Only if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness does it violate due process and thus warrant habeas relief." *Baze*, 371 F.3d at 323 (internal citations and quotations omitted); *see also Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) ("Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (internal citations and quotations omitted)).

In *Crane*, the Supreme Court dealt with this issue of reviewing state evidentiary rules and explicitly

> acknowledge[d] [its] traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts. In any given case the trial judge is called upon to make dozens, sometimes hundreds, of decisions concerning the admissibility of evidence . . . the Constitution leaves the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues'

*Crane*, 476 U.S. at 689-90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). The Court further recognized that the States have the power "to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability – even if the defendant would prefer to see that evidence admitted."[1] *Id*. at 690 (citations omitted).

### i.    Markey's Testimony

After conducting four sessions with Defendant, Dr. Oscar Markey, one of several psychiatric experts retained by Defendant's trial counsel, submitted a report in which he diagnosed Defendant as suffering from a schizotypal personality and latent atypical psychotic disorder. Markey opined in his report that Defendant would not have been able to control his impulse to assault his victims, even though he knew that it was considered wrong by society. In light of this report, Defendant's trial counsel called Markey to testify at trial in support of the defense's contention that Defendant was insane at the time of the shootings.

Prior to allowing Markey to testify before the jury, however, the trial court conducted a fairly extensive voir dire in which Markey was questioned about his conclusions as to Defendant's mental state. During the voir dire, Markey testified that Defendant suffers from a "schizotypal personality disorder" and "atypical psychotic disorder," but that he could not say that Defendant was psychotic at the time of the killings. Markey later stressed that Defendant has a "latent psychotic condition," repeatedly emphasizing in response to questions from defense counsel as to whether Defendant suffered from a mental illness, that Defendant's mental illness was "latent" and that the "potential is there," but that Defendant "cannot be diagnosed as having an active psychotic illness." (J.A. at

---

[1] The *Crane* Court held, however, that "without 'signal[ing] any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures,'" under those circumstances, where the trial court had excluded evidence of the surrounding circumstances of a defendant's confession, that "the blanket exclusion of the proffered testimony about the circumstances of Defendant's confession deprived him of a fair trial." *Id*. at 690 (citations omitted).

1990-91.) When asked whether Defendant knew that what he did was wrong, Markey replied, "[i]n our society . . . I know that he knows that we believe it is wrong, and that in this society in which he is trying to cure these ills, society thinks what he did was wrong," but "in his view he did the right thing and there is nothing to apologize for." (J.A. at 2000.)

When defense counsel asked whether Defendant could refrain from these acts, Markey gave a long, rambling, and confusing answer that prompted several more questions from counsel, but he eventually replied that "certainly, there are times when he would refrain, and I think he must have refrained in the past from acts like this because the consequences might be uncomfortable for him." (J.A. at 2007.) Markey then contradicted himself when asked whether Defendant was unable to refrain from killing blacks and Jews, and responded that it would seem that Defendant was unable to refrain from killing blacks and Jews. Markey then read from his report in which he stated that Defendant was "unable to control his impulses to assault, though he was at the time, aware of its being socially wrong." (J.A. at 2009-10.)

On cross examination, the prosecution challenged Markey on his theory that Defendant did not know the wrongfulness of his conduct.

Q.  Do you know what the legal test for insanity is?

A.  Yes.

Q.  What is that?

A. Did he know right from wrong, was he able to control any impulses which would have interfered with his knowledge of right from wrong.

Q.  And would he be – or was he able to refrain from committing the acts that he committed.

A.  It was obvious, I think he knew the difference, but remember he is changing the world by this act.

Q.  Well, if you believe what he says, that he killed the Reverend because the Reverend made a homosexual pass, you would agree that has nothing to do with his Nazi theory?

A.  That's right.

Q.  You also agree that he refrained from killing any Jews because as far as we know, he is not charged with killing any Jews?

A.  Because of what?

Q. He has not killed any Jews. Even if he espouses the philosophy of killing Jews, he has not done so. Therefore, we can conclude that he has refrained from killing the Jews. Fair enough?

A.  Yes.

Q.  I don't think we have any disagreement. You do say in all of the instances he knew the difference between right and wrong, and you do say in all of the instances he was able to refrain from committing those acts if he would have decided to refrain from doing it?

A. Yes.

(J.A. at 2012-13.)  After admitting that  Defendant knew the difference between right and wrong, and was able to refrain from his conduct, Markey later further contradicted his earlier conclusion that Defendant could not refrain from killing blacks and Jews by conceding on re-cross examination that he essentially agreed with the conclusion of another expert, Resnick, that "defendant knew the difference between right and wrong and that he was able to refrain."  (J.A. at 2027-28.)  Despite these damaging and contradictory admissions, however, the trial court ruled that Markey's conclusion that defendant could not control his impulse to assault created a question of fact for the jury, and decided to allow Markey to testify.

Once he was before the jury, Markey repeated his conclusions that Defendant suffered from a "schizotypal personality disorder" and a "possibility of a breakdown, which could equate mental illness."  (J.A. at 2074.)  Again, however, Markey still would not directly answer "yes" or "no" as to whether Defendant had a mental disease, but instead kept referring to the "potential," while conceding that Defendant did not "have an active mental disease."  (J.A. at 2079.)  At this point, the trial court excused the jury for an extensive sidebar, during which time the judge, in an effort to ascertain Markey's actual position on the issue of Defendant's sanity, asked Markey several direct questions about his diagnosis of Defendant.

> Q.  Doctor, in your opinion, obviously, it is based on reasonable medical certainty, does Mr. Spisak have a mental disease, actively present?
>
> A.  Actively, no.
>
> Q.  Presently does he have a mental disease?
>
> A. No.
>
> Q.  At the time these various crimes were committed, February 1, 1982 through August 3, 1982, is it your opinion based on reasonable medical certainty that Mr. Spisak had a mental disease at that time?
>
> A.  On the basis of what I know, no.

(J.A. at 2080.)  The judge then recalled the jury, and defense counsel was allowed to continue questioning Markey.  On cross examination,  the prosecution first got Markey to reaffirm that Defendant does not have a mental disease, stating "so, we can put that aside, mental disease and mental defect aside, and we agree that he does not have either one of these at this point, or in the past that you know of, correct?"  (J.A. at 2090.)  Markey answered in the affirmative.  Later towards the end of the cross-examination, the following exchange occurred, at which time Markey restated that Defendant could refrain from killing:

> Q.  All I'm indicating to you, doctor, and asking for your opinion is that he made a conscious decision to shoot, or not to shoot on each case that we have in this indictment?
>
> A.  Yes, he was not in a frenzy where he didn't know what he was doing.  He had a conception of what he was doing and he realized that he could have –
>
> Q.  He could have refrained from pulling the trigger on any of those five, had he chosen to do so?
>
> A.  Yes.

(J.A. at 2096.) Although Defendant's trial counsel then tried to rehabilitate Markey's testimony, it only proved to be further damaging when Markey stated on re-direct:

> The questions have been asked me before, indicate that in every instance in which he did assault, whether he killed or not, he was calculating and knew whether or not he could go ahead, in his view, he was positive in doing it, that he had enough conscious control over it to do it at a time when it would be to his advantage. . . .

(J.A. at 2097-98.)

The following morning, the prosecution filed an objection to the continuation of Markey's testimony on relevancy grounds, since Markey testified that Defendant did not suffer from a mental disease or defect at the time of the acts, and that Defendant knew the difference between right and wrong and was able to conform his conduct to the requirements of law. The prosecution moved that the testimony not continue and that it be stricken because it prejudiced the defense in that it re-established the presumption of sanity, and because it did not add anything and was not relevant to the issue since the law already presumes sanity. The prosecution further moved that the defense be required to withdraw its plea of not guilty by reason of insanity because there was not "one scintilla of evidence offered that the defendant is anything but sane, and was anything but sane at any of the times in the five charges or five indictments." (J.A. at 2103-04.) After hearing arguments from both sides, the trial court granted the prosecution's motion, reasoning that when a plea of not guilty by reason of insanity is entered, the expert offered by the defendant "must meet a certain minimal standard," which the court concluded had not been met in this instance. (J.A. at 2118.)

Upon review of the transcript of Markey's testimony, we agree with the district court that the exclusion of Markey's testimony did not violate Defendant's fundamental right to a fair trial. At the outset, we would like to note that this Court addressed a similar issue in the pre-AEDPA case, *Matlock v. Rose*, 731 F.2d 1236 (6th Cir. 1984). The defendant in *Matlock* appealed the district court's denial of his habeas petition, challenging the trial court's exclusion of a psychologist who testified that defendant Matlock knew right from wrong only on the intellectual level of an eight or nine year old. *Id*. at 1238. We rejected defendant's argument that "the exclusion of this testimony deprived him of his only defense, that of insanity," finding instead that the testimony proferred would not have supported an insanity defense under Tennessee law, and would in fact have probably undercut one. *Id*. at 1243 ("The evidence excluded . . . would not have made out a case of insanity . . . . At best, it would have shown that Matlock was retarded with some brain damage.").

We find the situation in *Matlock* to be somewhat analogous to the present case, and therefore conduct a similar analysis, beginning with Ohio's legal definition of insanity, and proceeding to consideration of whether the evidence proferred by Dr. Markey would have established that Defendant met this standard. We conclude that it would not have.

Under Ohio law, as it stood at the time of Defendant's trial, a person accused of a crime could be found to be "not guilty by reason of insanity" if "at the time of such conduct as a result of mental disease or defect, he does not have the capacity either to know the wrongfulness of his conduct or to conform his conduct to the requirements of law."[2] *State v. Staten*, 247 N.E.2d 293,

---

[2] Defendant correctly argues that the district court applied the wrong standard for an insanity defense under Ohio law at the time of his convictions. The district court utilized the standard for insanity set forth at Ohio Rev. Code § 2901.01(a)(14), which provides that "a person is 'not guilty by reason of insanity' relative to a charge of an offense only if he proves . . . that at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his conduct." This was the incorrect standard because this definition of insanity did not take effect until 1990, seven years after Defendant's trial in 1983. Although this was the wrong standard, the district court's analysis of the issue of the admissibility of Markey's testimony and ultimate conclusion is still correct.

296 (Ohio 1969).  As illustrated by the above-recounted excerpts, far from establishing that Defendant "had a mental disease or defect" and "did not know the wrongfulness of his conduct," Markey repeatedly stated that Defendant did not have a "present" mental defect or disease, and that Defendant knew the wrongfulness of his conduct.  Thus, Markey's testimony could not have supported Defendant's insanity defense, and in fact, even more so than was the case in *Matlock*, would likely have severely undercut such a defense since Markey explicitly diagnosed Defendant as not meeting the necessary elements of the insanity defense under Ohio law.

We also agree with the Eighth District Court of Appeal's conclusion that "there was a high probability that [Markey's] testimony would have confused the issue in the minds of the jurors and would not have aided the jury in understanding the evidence or in reaching a determination an legal sanity." *Spisak*, 1984 WL 13992, at *5 ("[W]hen a defendant calls an expert to testify on the issue of legal insanity, that expert's testimony must still meet the basic requirements of the Rules of Evidence.").[3]  Markey's testimony was often contradictory and inconsistent.  He opined that Defendant did not consider his actions to be wrong because he was ridding the world of bad persons, but that Defendant knew that society considered his actions to be wrong.  Markey first stated that Defendant could not refrain from killing blacks and Jews, but then contradicted himself on cross examination, admitting that Defendant could and did in fact refrain at times from engaging in such conduct.  Markey also thought the Defendant was a schizotypal personality, but that Defendant had only a "latent" mental disease or defect, not one that was "actively present."  For the most part, it is difficult for this Court, let alone a jury, to discern whether Markey actually believed that there was a clinical diagnosis for what was wrong with Defendant.  It does seem blatantly apparent from his testimony, however, that Markey did not believe that Defendant met the legal definition of insanity under Ohio law.  Therefore, Defendant's fundamental rights were not infringed by the trial court's decision to exclude Markey's testimony.

### ii.     Other Expert Reports and Evidence

We similarly agree with the district court that the trial court properly excluded the other expert reports where all of the experts opined that Defendant knew the wrongfulness of his conduct when he carried out the shootings.  After the district court excluded Markey's testimony, the defense proffered Exhibits D through K, which included expert reports from doctors Markey, Resnick, McPherson, Bertschinger, Samy, Williger, and Althof, contending that these doctors would testify to Defendant's sanity and "would give a better profile of the characteristics and personality of the defendant Frank Spisak such that the Court would at that time charge on the issue of sanity to the jury." (J.A. at 2121.)  A detailed review of the proffered reports show, however, that none of the doctors concluded that Defendant met the standard for insanity under Ohio law.  Resnick concluded, first, that Defendant did not have a mental disease or defect at the time of the crimes, and second, that he "knew the wrongfulness and was able to refrain from each of the acts . . . charged." (J.A. at 3204.)  McPherson made the following diagnosis:

---

[3]In deciding the issues on appeal, the Ohio Eighth District Court of Appeals cited to the following rules of evidence:

> Rule 403:
> (A) *Exclusion Mandatory*.  Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury.
> (B) *Exclusion Discretionary*.  Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence.
> Rule 702:
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> Mr. Spisak's functioning at this time is nonpsychotic, although he has potential for deterioration under condition of minimal stress of [sic] even in situations where there is lacking adequate external control . . . his accounts of the incidents do not meet the criteria for an insanity defense.   Nonetheless, he is a significantly disturbed individual whose defect of mental state is pervasive, and was the general cause of his acts."

(J.A. at 3214-15.)  Bertschinger also diagnosed Defendant as having a schizotypal personality and stated the following:

> The defendant, Frank Spisak, demonstrates severe defects in his personality structure . . . He has severe conflicts regarding his sexual identity and his sexual impulses are fused and intermingled with aggressive impulses . . . Generally speaking, personality disorders are not considered to be mental disease or mental illness when being used in an insanity defense.   However, it is my opinion that Mr. Spisak's personality deficits are of such severity that he can be considered to have a mental illness or mental disease.   However, in carefully reviewing his mental state at the time of the alleged crimes, it is my opinion that he knew the wrongfulness of his acts and had the ability to refrain from the acts.

(J.A. at 3217.)  Samy's report from the Ohio Department of Mental Health stated in pertinent part that Defendant was sane at the time of all the shootings, and that Defendant "was found to be not mentally ill as defined by the Ohio Revised Code," although "he has a personality disorder and identity disorder." (J.A. at 3225.)  Lastly,[4] Althof concluded that:

> While one could make a case for a chronic psychotic process, his ego dysfunctions are neither so pervasive nor profound, as to warrant such a severe diagnosis . . . A personality disorder diagnosis does not do justice to the severity of the patient's psychological condition and yet his record is not consistent with that of an overt psychotic disorder.

(J.A. at 3239.)

The partial dissent argues that Defendant had some right "to present evidence of his insanity cumulatively."   Criminal defendants in Ohio do not have a right to cobble together an insanity defense by selectively relying upon favorable portions of psychiatric expert reports when no single report supports a finding of insanity.   Nor do criminal defendants have an incontrovertible right to offer psychiatric testimony in all circumstances where they believe it might conceivably advance their defense. *See State v. Wilcox*, 436 N.E.2d 523 (Ohio 1982) (barring criminal defendants from "offer[ing] expert psychiatric testimony, unrelated to the insanity defense" to negate mens rea); *State v. Taylor*, 781 N.E.2d 72, 84 (Ohio 2002) (upholding a trial court decision to exclude expert testimony which "did not support [the defendant's] insanity defense, since all three experts concluded he was not insane").   Further, criminal defendants certainly do not have a right to present the sort of irrelevant and confusing testimony proffered by the experts in Defendant's case.   As previously discussed, Markey's testimony was riddled with contradictions: his statements on cross examination often directly countered those on direct.   The single point of agreement among all of Defendant's other experts was that Defendant had a personality disorder.   Finally, even if the trial court had admitted these reports, taken as a *whole*, they still would not have provided support for a "not guilty by reason of insanity defense."   With the exception of Markey's internally inconsistent testimony, *none* of Defendant's experts found that "at the time of the criminal act with which he

---

[4]Williger's report provides a detailed account of various interviews with Defendant and his family members, but does not evaluate the information to reach independent conclusions about Defendant's mental health.

[was] charged, either he did not know that such act was wrong or he did not have the ability to refrain from doing that act." *See Staten*, 247 N.E.2d at 299.

It was therefore consistent with Defendant's rights for the trial court to exclude this evidence. The Supreme Court has held that, under these circumstances, judges in the position of having to make these decisions must have "wide latitude" to exclude evidence that they think is irrelevant, potentially harmful or confusing to the jury. *Crane*, 467 U.S. at 689-90. While a defendant is entitled to strong latitude in presenting his defense, we are not willing to substitute our judgment for that of the state trial court in this instance, where the record shows that the trial court's decision was not objectively unreasonable, taking into consideration the language of the Supreme Court in *Crane*. Although the partial dissent likens this case to *Chambers* and *Crane*, clear distinctions lie between those cases and Defendant's case. In *Chambers*, the trial court applied state evidentiary rules to prevent the defendant from adversely examining his witness, a third party who previously confessed to the crime charged against the defendant, and also excluded as hearsay the testimony of three witnesses that the third party confessed to the crime. *Chambers*, 410 U.S. at 291-92. The testimony excluded in *Chambers* was mutually reinforcing, and wholly exculpatory if credited by the jury. In Defendant's case, the psychiatric testimony and reports were contradictory – sometimes even internally inconsistent, as with Markey's stricken testimony at trial. Additionally, even if the jury credited these inconsistent reports, they did not necessarily exculpate Defendant. Finally, while the evidentiary rulings in *Chambers* were destructive of the trial court's truth-finding purpose, *see id*. at 297 n.8 ("The 'voucher' rule has been condemned as archaic, irrational, and potentially destructive of the truth-gathering process."), the trial court's rulings here were consistent with the goal of truth-seeking since Defendant's contradictory and inconsistent expert testimony would only engender confusion and speculation.

In *Crane*, the Supreme Court found that a "meaningful opportunity to present a complete defense" included the right to present "competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." 476 U.S. at 690 (internal citations omitted). There, the defendant confessed to the crime charged under coercive circumstances and, pursuant to a pretrial ruling on a motion to suppress, the court excluded all testimony at trial bearing on the circumstances of that confession. *Id.* at 690. Unlike the "potentially exculpatory" and "indispensable" evidence in *Crane*, the expert testimony in Defendant's case merely established mental problems and *not* insanity. Thus, it cannot be said that such testimony rose to the level of "indispensable" or "potentially exculpatory." Without question, as the partial dissent asserts, Defendant's experts were "competent" and "reliable" in their field. Indeed, these experts so reliably discharged their function that they did not bend their findings or shade their words to find insanity where it did not exist. Their testimony, however reliable their reputations, could not be taken to establish Defendant's legal insanity under Ohio law.

Far from "mechanistically appl[ying] the evidentiary relevancy standard" here – a result strongly disfavored where a defendant's right to present a defense is involved – the trial court gave Defendant's expert every opportunity to meet the court's evidentiary requirements. The trial judge allowed Defendant's expert to testify before the jury notwithstanding his persistent tendency to contradict himself during voir dire, entertained his internally inconsistent testimony before the jury, dismissed the jury for a sidebar during which the judge himself questioned Markey to clarify the expert's position, recalled the jury and allowed Markey to continue testifying, and ultimately entertained the arguments of both the prosecution and defense on the relevance of Markey's testimony. This cannot be offhandedly equated with the type of "mechanistic" application of evidentiary rules or "blanket exclusion" of evidence that so clearly deprives a criminal defendant of his right to present a defense.

The evidence in the record simply does not support a conclusion that Defendant's fundamental right to a fair trial has been infringed by the exclusion of the expert evidence, where

the experts did not diagnose Defendant as being insane within the legal definition under Ohio law. It was conceivably within the discretion of the trial court to have admitted this evidence, and perhaps, were we in the position of the trial judge, we might have permitted Defendant to present the testimony of his experts. Under the AEDPA standard, however, we cannot overturn the discretionary evidentiary rulings of a state trial court in the absence of evidence that the trial court acted in a manner that was contrary to, or a violation of, clearly established federal law.

The partial dissent draws support for the opposite conclusion from *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985). Respectfully, such reliance is misplaced. As the partial dissent correctly observes, *Ake* held that "due process requires that indigent defendants be afforded the assistance of a psychiatrist in preparing a defense." In this case, Defendant benefitted from the assistance of not one, but *seven* experts in his attempt to demonstrate insanity. Those experts evaluated Defendant, diagnosed him, and prepared reports detailing their diagnoses. Not one of those seven experts could testify honestly and unequivocally that Defendant met Ohio's legal definition of insanity. Nor could their conclusions "cumulatively" justify that result. The *holding* in *Ake* does not require a trial court to permit such irrelevant testimony.

### B.        Refusal To Instruct The Jury As To The Insanity Defense

Defendant also charges that the trial court improperly refused to instruct the jury on the insanity defense. We disagree. The "not guilty by reason of insanity" defense is an affirmative defense under Ohio law, and the defendant has the burden of going forward with the evidence of an affirmative defense.[5] Ohio Rev. Code 2901.05(A); *see also State v. Humphries*, 364 N.E.2d 1354, 1356 (Ohio 1977); *State v. Chase*, 378 N.E. 1064, 1068 (Ohio 1978) ("Under the statute, a defendant who pleads not guilty by reason of insanity has the burden of going forward with evidence of a nature and quality sufficient to raise the defense before the jury."); *State v. Robbins*, 388 N.E.2d 755, 758 (Ohio 1979) ("The proper standard for determining in a criminal case whether a defendant has successfully raised an affirmative defense under R.C. 2901.05 is to inquire whether the defendant has introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issue.").

Even though the burden of going forward is on the defendant, "[w]hen from the evidence reasonable minds may reach different conclusions upon the question of insanity, such question of fact is for the jury." *State v. Reynolds*, 550 N.E.2d 490, 495 (Ohio Ct. App. 1988); *State v. Filiaggi*, 714 N.E.2d 867, 889 (Ohio 1999) (quoting *State v. Thomas*, 434 N.E.2d 1356, syllabus (Ohio 1982)) ("The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts.") "If however, after giving the evidence the most favorable interpretation in favor of the defendant, reasonable minds can come to but one conclusion and that conclusion is adverse to the defendant, it is the trial court's duty to rule on the issue as a matter of law." *Id*. (citations omitted) (holding that there was enough evidence to permit a reasonable jury to find that Reynolds was legally insane at the time the crime was committed; therefore, it was error for the trial court to withdraw the insanity defense from the jury and refuse to instruct the jury concerning the insanity defense).

We have already discussed what we believe to be the insufficiency of Defendant's proffered expert testimony and evidence for establishing an insanity defense. In addition to proffering the reports of the mental health experts, Defendant also called his sister and ex-wife to testify as to his

---

[5]Ohio Rev. Code 2901.05(a) provides: "Every person accused of an offense is presumed innocent until proven guilty beyond a reasonable doubt, and the burden of proof for all elements of the offense is upon the prosecution. The burden of going forward with the evidence of an affirmative defense, and the burden of proof, by a preponderance of the evidence, for an affirmative defense, is upon the accused."

mental state. Defendant's sister, Nadine, testified that Defendant once told her about an incident in which he killed somebody and that he seemed to take delight in the killing. "I thought he was crazy. He had that wild look in his eyes." (J.A. at 2131.) She also testified that she had often told Defendant that "he was crazy" and that there was "something wrong with [him]." (J.A. at 2131.) Nadine further testified about Defendant's involvement with Nazi groups and teachings, and said that she thought Defendant was insane for being a Nazi. She described incidents in which Defendant would dress in a Nazi uniform, but at other times wear the Star of David while listening to Hitler tapes. She also spoke about Defendant's cross-dressing. Nadine told the court that she thought that there was something dominating or possessing Defendant.

Defendant's ex-wife, Laverne Spisak, also testified about Defendant's listening to Hitler records, and his cross-dressing. (J.A. at 2174-76.) Laverne testified that Defendant started cross-dressing after a car accident in 1976 that "messed his mind up . . . he was a little sick . . . it affected his mind very bad." (J.A. at 2176-77.) She said that she told him that he was "sick in the head" and needed help. (J.A. at 2178.) Laverne described one incident in which Defendant brought home a man dressed as a woman, and went to bed with the man, leaving her on the couch. Laverne testified that she left Defendant at that point because she thought he was "sick in the head," but later tried to reconcile a couple of years later. (J.A. at 2180-82.)

Defendant seeks to rely upon the decision from the Ohio Second District Court of Appeals, *State v. Reynolds*, 550 N.E.2d 490 (Ohio Ct. App. 1988), where the court ruled that lay witness testimony could establish an insanity defense. In *Reynolds*, the trial court refused to instruct the jury on the insanity defense because the expert had concluded that defendant Reynolds was "psychologically troubled but not insane." *Id*. at 495. The Second District Court of Appeals reversed on the ground that Defendant had provided competent lay witness testimony from his sister, that went to the issue of Defendant's sanity. *Id* at 496. ("Where the jury has competent testimony from lay witnesses that would permit the jury to conclude that a defendant's reason was so impaired by disease or other defect of the mind at the time of the criminal act that he either did not know that such act was wrong, or did not have the ability to refrain from doing that act, a jury is permitted to so find.").

The Court found that the testimony provided by Reynold's sister was enough to create a jury question on the issue of insanity where the sister testified "concerning Reynolds' extensive history of hospitalization for mental illness, and his use of antipsychotic drugs." *Id* at 494. The sister provided information about Reynolds' erratic behavior when he is off his medication, and further testified that to her knowledge, Reynolds was not on his medication at the time of the assault that was the subject of the trial. *Id*. The court found that this testimony was enough "from which a reasonable juror might conclude that Reynolds' reason was so impaired at the time of the criminal act that he either did not know that such act was wrong, or did not have the ability to refrain from doing the act." *Id*. at 495.

In contrast to the lay witness testimony provided by the sister in *Reynolds*, the testimony of the lay witnesses in the present case was not of a nature or quality sufficient to create a jury question on the issue of Defendant's sanity. Defendant's ex-wife and sister described unusual, perhaps even bizarre behavior that certainly may have been questionable and alarming for Defendant's family, but this type of behavior does not raise a question of legal insanity. Our society is rife with cross-dressers, latent homosexuals, bisexuals and even Hitler-supporting Nazis. While this type of behavior may be considered socially unacceptable by many, it by no means is determinative of legal insanity.

Furthermore, juxtaposed against the testimony from Laverne and Nadine that Defendant was crazy or that "there was something wrong with him," there was also a great deal of evidence and testimony about the fact that Defendant selectively chose his victims and the times he would kill,

in an effort to avoid being caught. This evidence suggests that Defendant was not unaware of the wrongfulness of his conduct or unable to refrain from committing the murders. Dr. Resnick testified and read extensive extracts from his report of his interviews with Defendant, and Defendant's account of the various incidents. For instance, after his first encounter with the victim Timothy Sheehan, in which Defendant attempted to engage Sheehan sexually in the men's room at Cleveland State University, Defendant reported to Resnick that "he left the men's room because he was unsure if Mr. Sheehan might call the police, and spent 45 to 60 minutes in the library nearby." (J.A. at 2278.) Defendant also reported that he shot Reverend Rickerson because Rickerson was in "his stall," he was in a bad mood, and also because Rickerson persisted in making homosexual advances toward him. (J.A. at 2279.) Afterward, Defendant "ran out quickly because he was scared." Defendant admitted to Resnick that "he would not have shot him if others had been in the bathroom for fear of being caught." (J.A. at 2279.)

Defendant told Resnick that he tried to kill Coletta Dartt because he became angry when he heard people making fun of the "White People's Party." He decided to teach her a lesson and intended to "slap the shit out of her and rob her" when she came out of the ladies' room at Cleveland State. (J.A. at 2280.) Defendant also said that robbery was in part the motivation for the shooting of Timothy Sheehan. He said that he needed money and "he thought in his mind that it was not fair that this man had money and he did not" and "[h]e knew that if he did take money from him and let him live, the victim might identify him in the future." (J.A. at 2282.) Defendant then shot Sheehan four times, and afterward, he reported that he searched Sheehan for cash and left "real quick because he did not want to get caught." (J.A. at 2282.) Defendant also reported that the Friday after the shootings in the bathroom, he and a friend went out "looking for black people to shoot," but did not manage to shoot any. (J.A. at 2283.) They tried again the following Sunday, but again abandoned their plan "rather than risk getting caught." (J.A. at 2283-84.) According to Defendant, his friend "was more conservative and discouraged him from shooting unless the situation was safe." (J.A. at 2284.)

Defendant's own testimony at trial also contradicts the idea that he was insane at the time of the killings. When asked why he killed Reverend Rickerson, Defendant responded that he killed Rickerson "because he was bothering me. He was making obscene lewd gestures at me . . . He wasn't leaving me alone." (J.A. at 1447.) Defendant himself testified that after shooting Sheehan, he picked up the brass casings from his gun because the brass is worth money and also because "it's sloppy to leave it laying around." (J.A. at 1602.) Defendant further testified that he shot Hardaway on the other side of town away from Cleveland State, where the other shootings had taken place, because "he didn't want the police to link the two shootings together and link it to [him]," and he "didn't want to get caught." (J.A. at 1791.) After testifying that he shot the victim Brian Warford sitting in the bus shelter eight times in the head because Warford was "one of the enemies," Defendant then said that he felt good about the shooting, but "was just worried about getting back across to the other side of the campus to where I put the car because I figured in the early morning hours it was so quiet somebody was bound to hear all the shots." (J.A. at 1573.) In further efforts to avoid being linked to the murders, Defendant cut off the barrel and rubbed off the serial numbers of the gun he used. (J.A. at 1767.) After police discovered that Defendant was the shooter, they found Defendant hiding out in the cellar of a friend's basement until he could leave town to avoid capture. (J.A. at 1801.)

On the balance of the evidence presented at trial, we conclude that the trial court did not err in refusing to instruct the jury on the insanity defense. Defendant did not present sufficient evidence to make it an issue for the jury. The experts all concluded that Defendant was sane and knew the wrongfulness of his conduct. The evidence of decisions that were made by Defendant to not act at certain times or to take measures to avoid getting caught weigh heavily against a finding that Defendant was legally insane. Also, the mere fact that Defendant was engaged in Nazi activities and considered himself to be part of a race war does not create an inference that he was legally insane.

Defendant testified that he wanted to "get as many [black people] as I could before I got caught, one thousand, a million, the more the better." (J.A. at 1449.) Defendant said he armed himself "for the race war." (J.A. at 1451.) Again, while these views are anti-social and probably evidence of a serious personality disorder, we are not prepared to hold that Neo-Nazi, racist and anti-Semitic views establish a lack of guilt by reason of insanity, where the evidence clearly suggests that Defendant did not have a mental disease or defect, and knew the wrongfulness of his conduct.

## II.     Ineffective Assistance of Counsel During Mitigation Phase

The Supreme Court first articulated the now familiar two-part test for determining whether counsel is ineffective in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a defendant seeking to establish that his counsel's assistance was ineffective must show: (1) that his counsel's performance was deficient, in other words, that it "fell below an objective standard of reasonableness;" and (2) that the defense was prejudiced by the attorney's deficient performance. *Strickland*, 466 U.S. at 687-88. Although trial counsel's performance here is subject to *de novo* review, the reviewing Court's scrutiny of counsel's performance is highly deferential, and counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *McQueen v. Scroggy*, 99 F.3d 1302, 1311 (6th Cir. 1996) (overruled on other grounds). The reviewing Court must "evaluate the reasonableness of counsel's performance within the context of the circumstances at the time of the alleged errors." *Id*. (citations omitted). "Trial counsel's tactical decisions are particularly difficult to attack, and a defendant's challenge to such decisions must overcome a presumption that the challenged action might be considered sound trial strategy." *Id*. (internal citations and quotations omitted).

In order to establish deficiency under *Strickland*, Defendant must show that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [Defendant] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To satisfy the prejudice prong of the *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The inquiry, when a defendant challenges a conviction, is whether "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id*. at 695; *see also Wiggins v. Smith*, 539 U.S. 510, 537 (2003) (Defendant demonstrates prejudice if he can show that there is a reasonable probability that "at least one juror would have struck a different balance").

The *Strickland* Court explained that while strategic choices made after a thorough investigation

> are virtually unchallengeable . . . strategic choices made after a less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigation or to make a reasonable decision that a particular investigation is unnecessary.

*Id*. at 690-91. Thus it follows that any decision to forego mitigation evidence is unreasonable if not made after a reasonable decision to cease further investigation. *See id.*

### A.     *Hostile Remarks During The Closing Argument Of The Mitigation Phase*

Defendant first argues that his counsel rendered ineffective assistance during his closing argument at sentencing by repeatedly stressing the brutality of the crimes and demeaning Defendant. We agree. The transcript reveals that in the early part of the closing, trial counsel did focus rather heavily on what he called the aggravating circumstances and the heinousness of the crimes. Defendant's trial counsel addressed the jury, telling them that "so little really needs to be said about

the degree of aggravating factors, clearly horrendous," and pointed out that no one involved in the trial was ever going to forget it or Defendant. (J.A. at 3061.) Trial counsel went on to make the following disturbing remarks:

> [E]veryone of us who went through this trial, we know we can feel that cold day . . . or see that cold marble, and will forever . . . see Horace Rickerson dead on the cold floor. Aggravating circumstances, indeed it is . . . the reality of what happened there . . . you can smell almost the blood. You can smell, if you will, the urine. You are in a bathroom, and it is death, and you can smell the death . . . and you can feel, the loneliness of that railroad platform . . . And we can all appreciate, and you can understand, and we can all know the terror that John Hardaway felt when he turned and looked into those thick glasses and looked into the muzzle of a gun that kept spitting out bullets . . . And we can see a relatively young man cut down with so many years to live, and we could remember his widow, and we certainly can remember looking at his children . . . you and I and everyone one of us, we were sitting in that bus shelter, and you can see the kid, the kid that was asleep, the kid that never [sic] what hit him, and we can feel that bullet hitting, and that's an aggravating circumstance . . . There are too many family albums. There are too many family portraits dated 1982 that have too many empty spaces. And there is too much terror left in the hearts of those that we call lucky.

(Id. at 3062-65.) The district court concluded that this extremely graphic and overly descriptive recounting of Defendant's crimes were an appropriate part of trial counsel's strategy to confront the heinousness of the murders before the prosecution had the opportunity to do so. The district court reasoned that once counsel identified with their emotions towards Defendant, he could then explain to them that their feelings were misplaced because Defendant was mentally ill. Had Defendant's trial counsel actually done the latter, and spent a substantial amount of the time humanizing and rehabilitating Defendant in the eyes of the jury by arguing that Defendant was misguided or mentally ill and deserved to have his life spared, then the district court might be correct that this was permissible trial strategy. The record reveals, however, that trial counsel did very little to offset the negative feelings that his own hostility and disgust for Defendant may have evoked in the jury. Instead, as Defendant argues, trial counsel further denigrated Defendant and even went so far as to tell the jury that Defendant was undeserving of mitigation.

Trial counsel's efforts at presenting mitigating evidence consisted of telling the jury about what he described as Defendant's "sick twisted mind" and his association with the Third Reich and the Nazis, and what counsel perceived it was like to be inside Defendant's mind, based on Defendant's testimony about the murders. While trial counsel did then try to stress that Defendant was mentally ill, even if not legally insane, trial counsel proceeded to undermine this limited effort by making the following inexplicable remarks:

> Sympathy, of course, is not part of your consideration. And even if it was, certainly, don't look to him for sympathy, because he demands none. And, ladies and gentlemen, when you turn and look at Frank Spisak, don't look for good deeds, because he has done none. Don't look for good thoughts, because he has none. He is sick, he is twisted. He is demented, and he is never going to be any different.

(J.A. at 3069.) Trial counsel's performance did not improve after this, but rather counsel continued to do further harm to Defendant by rambling incoherently towards the end of the closing statement about integrity in the legal system. Trial counsel's final moments were not devoted to a discussion of the reasons why Defendant's mental illness made him deserving of mitigation, but rather to discussing all the other participants in the trial. Namely, trial counsel discussed the jurors, lawyers, the judge, policemen, and the victims' families, and focused on the importance of the jury's decision

to all of these various individuals, instead of arguing how and why the mitigating factors outweighed the aggravating factors. Most shocking of all, however, trial counsel suggested to the jury that either outcome, death or life, would be a valid conclusion, by stating to the jury that "whatever you do, we are going to be proud of you." (J.A. 3101.)

We find persuasive Defendant's argument that in pursuing this course, trial counsel abandoned the duty of loyalty owed to Defendant, as was the case in *Rickman v. Bell*, 131 F.3d 1150 (6th Cir. 1997). In *Rickman*, counsel pursued a similar strategy of attempting to portray his client as a "sick" and "twisted" individual which should mitigate the death sentence. Trial counsel's strategy in *Rickman* involved repeated attacks on his client's character, eliciting damaging character evidence about his client, making disparaging comments to any witness who spoke favorably about his client, and apologizing to the prosecutors for his client's crime. *Id.* at 1157. This court concluded that counsel's performance was "outrageous" because his attacks on Rickman equaled or exceeded those of the prosecution. *Id.* The court found that the defendant was effectively deprived of assistance of counsel in light of the severity of counsel's conduct. *Id.* at 1160.

We believe that trial counsel's actions discussed above are so egregious that they are equivalent to those in *Rickman*, and similarly deprived Defendant of effective assistance of counsel, in violation of the Sixth Amendment. Here, as in *Rickman*, trial counsel's hostility toward Defendant aligned counsel with the prosecution against his own client. Much of Defendant's counsel's argument during the closing of mitigation could have been made by the prosecution, and if it had, would likely have been grounds for a successful prosecutorial misconduct claim. As was the case in *Rickman*, "[th]e effect [counsel] created was not one of pity for a pathetic [Defendant], but one of hostility toward the hated and violent freak." *Id.* at 1160. In light of all the circumstances of this case, and even conceding that counsel faced some unique challenges, we still find that Defendant has rebutted the "strong presumption" that counsel's actions constituted "sound trial strategy." *Strickland*, 466 U.S. at 689. Defendant is correct that "there cannot be any objectively reasonable tactical reason to argue to the jury in a mitigation phase that one's client has no redeeming qualities, will never be rehabilitated, has never done a good deed, is not deserving of no (sic) sympathy, and is entitled to no mitigation." (Def.'s Br. at 64.) Absent trial counsel's behavior during the closing argument of the mitigation phase of the trial, we find that a reasonable probability exists that at least one juror would have reached a different conclusion about the appropriateness of death, and may have voted for life instead. Therefore, we reverse the district court's denial of habeas on this claim.

### B.	*Failure To Adequately Investigate Defendant's Background*

We find unpersuasive, however, Defendant's claim that trial counsel should have presented more evidence to the jury during the mitigation phase of the trial. The Supreme Court has now applied *Strickland* in the AEDPA context at least three times to hold that a defense attorney's failure to adequately investigate and present mitigating evidence at the sentencing phase of a death penalty trial constitutes ineffective assistance of counsel. *See Rompilla v. Beard*, 545 U.S. 374, 383 ( 2005); *Wiggins*, 539 U.S. at 537-38; *Williams*, 529 U.S. at 390. In those cases, the Court cautioned that trial counsel has an "obligation to conduct a thorough investigation of the defendant's background" in death penalty cases. *Wiggins*, 539 U.S. at 522 (citing ABA guidelines advising attorneys to conduct through investigations); *Williams*, 529 U.S. at 396. In this context, the Supreme Court has warned against a tendency to invoke "strategy" as a "*post-hoc* rationalization of counsel's conduct [rather] than an accurate description of their deliberations prior to sentencing" to explain counsel's decisions. *Id.* at 527.

This Court has to first determine whether counsel conducted a reasonable investigation of Defendant's background. Prior to trial, an extensive social history was obtained on Defendant, based on interviews with Defendant, his father, mother, and two sisters as well as various medical

records. The report contained information about the family dynamics, including the fact that Defendant's father was emotionally distant and that his mother was a strict disciplinarian. Defendant argues that this information should have led to further investigation into his background, and that trial counsel should have presented various childhood experiences as mitigating evidence. However, the only relevant background that Defendant argues should have been put forth is the fact that he had an extremely strict mother who humiliated and hit him when he displayed sexual behavior, and who also taught him to hate people of color and others whom she deemed to be "undesirable" or "repulsive." (Def.'s Br. at 68-72.) Defendant argues that this information would have helped the jury understand his troubled history and would have provided some explanation for his behavior.

Despite Defendant's claim that more information should have been presented, the record shows that the various mental health experts retained by defense counsel to establish an insanity defense all testified and talked about Defendant's childhood, and the fact that it was marked by social isolation and a lack of ability to form inter-group relationships. The experts also discussed Defendant's gender confusion, and how that was tied to violent tendencies and the urge to kill. During Dr. Bertschinger's testimony, counsel inquired into, and Bertschinger discussed, Defendant's pursuit of a sex change operation.

In light of the evidence that was presented, we do not agree that trial counsel was ineffective in failing to properly investigate Defendant's background. Moreover, even if there should have been more investigation, Defendant must demonstrate that he suffered prejudice as a result of counsel's omission, and that at least one juror would have reached a different result had this additional evidence been presented. *See Wiggins*, 539 U.S. at 536; *Hamblin v. Mitchell*, 354 F.3d 482, 493 (6th Cir. 2003). Defendant has not shown that a reasonable probability exists that one juror would have reached a different conclusion given additional evidence. The best chance of mitigation available was in fact the evidence that Defendant was, to some degree, mentally ill. If the extensive evidence of Defendant's severe personality disorder, flirtation with the idea of having a sex change, sexual confusion, and social isolation was not enough to sway jurors, then we do not believe that evidence that Defendant's mother was a strict disciplinarian would have changed the mind of at least one juror.

Furthermore, this additional evidence does not rise to the level that this court generally has required to demonstrate prejudice. *See Hamblin*, 354 F.3d at 490-91 (where counsel failed to discover evidence of extreme poverty, neglect, violence, and instability, as well as a mental disorder); *Coleman v. Mitchell*, 268 F.3d 417, 450-51 (6th Cir. 2001) (where counsel did not discover defendant's history of abandonment, physical and psychological abuse, and pedophilia, as well as personality disorder and probable psychosis); *Greer v. Mitchell*, 264 F.3d 663, 678 (6th Cir. 2001) (counsel did not follow-up on knowledge of family history which included violence, foster care, incarceration, and alcoholism); *Carter v. Bell*, 218 F.3d 581, 596-97 (6th Cir. 2000) (counsel did not investigate childhood history of violence and instability). Defendant's only additional evidence is that his mother was a strict disciplinarian, his father was often absent, that his mother would hit him for expressing sexual behavior, and that his mother taught him to distrust black people. Taken together, this is not enough to establish prejudice. Indeed, Defendant's childhood appears to have been relatively stable, with no poverty, and an absence of physical abuse, other than corporal punishment.

We should also note that we find unpersuasive Defendant's argument that it was unreasonable for trial counsel to utilize the same experts who were retained to testify as to Defendant's sanity. This argument has no merit where the record establishes that these experts did in fact testify during mitigation about the effects that Defendant's childhood, sexual confusion, racism, and "personality disorders" may have had on his behavior. There was no need for counsel

to retain a new battery of experts to essentially reproduce what had been done by doctors Markey, McPherson, and Bertschinger.

Lastly, we do not believe that it was unreasonable for trial counsel to push to have the mitigation phase of the trial begin the day after the jury rendered the verdict. Several of the experts were leaving town, and trial counsel decided not to seek a continuance. While Defendant argues that this expeditious push to mitigation meant that trial counsel had not had time to prepare the strongest possible mitigation case, we have no way to determine from the record below how or when trial counsel prepared for mitigation. As far as we know, trial counsel may have had, and certainly should have had, a team working on mitigation for weeks beforehand, thereby making it unnecessary to seek a continuance. We are not in a position to say that trial counsel's failure to seek a continuance constituted a deficiency that caused Defendant prejudice.

In conclusion, we grant Defendant habeas relief on his ineffective assistance of counsel claim on the basis of counsel's hostile and inept statements and lack of advocacy during the closing argument of the mitigation phase of the trial.

## III.    Acquittal First Jury Instruction

Defendant next claims that the trial court unconstitutionally instructed the jury that its sentencing decision had to be unanimous and gave an improper "acquittal-first" jury instruction. The district court concluded, and we agree, that Defendant's argument has merit under this Court's prior holding in *Davis v. Mitchell*, 318 F.3d 682 (6th Cir. 2003). In *Davis*, this Court granted habeas relief to a death sentenced defendant because it determined that the acquittal-first jury instruction, combined with a verdict form that required the signature of all twelve jurors, likely led the jurors to conclude that mitigation factors also had to be found by all twelve jurors, thereby precluding an individual juror from giving effect to mitigation evidence not found by the others. *Id*. at 689.

While a trial court's sentencing phase instructions may require juror unanimity as to the results of the process of weighing aggravating circumstances and mitigating factors, the instructions cannot require unanimity as to the presence of a mitigating factor. *Mills v. Maryland*, 486 U.S. 367 (1988); *see also Roe v. Baker*, 316 F.3d 557, 563-64 (6th Cir. 2002); *Williams v. Coyle*, 260 F.3d 684, 702 (6th Cir. 2001); *Coe v. Bell*, 161 F.3d 320, 337-39 (6th Cir. 1998). Further, an "acquittal-first" instruction, which requires the jury to unanimously reject a death sentence before considering other sentencing alternatives, is unconstitutional. *Mapes v. Coyle*, 171 F.3d 408, 416-17 (6th Cir. 1999). In *McKoy v. North Carolina*, 494 U.S. 433, 435 (1990), the Supreme Court ruled unconstitutional any requirement that "prevents the jury from considering, in deciding whether to impose the death penalty, any mitigating factor that the jury does not unanimously find." Under *McKoy*, each juror must be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of death. *Id*. at 443; *Mills*, 486 U.S. at 374-75. Aggravating factors must be found unanimously because they are the elements of the murder offense that make the defendant death eligible. *Davis*, 318 F.3d at 687. "Mitigating factors, on the other hand, are not viewed as elements of the crime but rather as evidence relevant to a defendant's character or record or other circumstances of the offense that might lead a sentencer to decline to impose the death sentence." *Id*. at 688. Therefore, a state may not require unanimity in finding mitigating factors because such a requirement "impermissibly limits jurors' consideration of mitigating evidence." *Id*. (citing *McKoy*, 494 U.S. at 444). "In fact, as *Mills* and *McKoy* hold, any requirement that mitigating factors must be found unanimously is incoherent." *Id*. In other words, "in order for Eighth Amendment law on mitigating factors to be coherent and capable of judicial administration without serious confusion, a capital jury must understand that . . . a finding with respect to a mitigating factor may be made by one or more members of the jury." *Id*. (internal citations and quotations omitted).

In light of the case law discussed above, this Court's inquiry in the present case is, "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id.* (quoting *Jones v. United States*, 527 U.S. 373, 390 (1999); *Boyde v. California*, 494 U.S. 370, 380 (1990)). We think that the answer is "yes." During the mitigation phase, the trial court read the following instructions to the jury:

> [T]he procedure which you must follow in arriving at your verdict in this sentencing hearing is set forth in Section 2929.03 of the Revised Code of the State of Ohio . . . . you must determine whether, beyond a reasonable doubt, the aggravating circumstances, which the defendant, Frank G. Spisak, Jr., has been found guilty of committing in the separate counts are sufficient to outweigh the mitigating factors present in this case. If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances in each separate count outweighs the mitigating factors, then you must return that finding to the Court. I instruct you, as a matter of law, that if you make such a finding, then you must recommend to the Court that a sentence of death be imposed upon the defendant, Frank G. Spisak, Jr.
>
> A jury recommendation to the Court that the death penalty be imposed is just that, a recommendation. The final decision is placed by law upon the Court.
>
> On the other hand, if after considering all of the relevant evidence raised at trial, the evidence and the testimony received at this hearing and the arguments of counsel, you find that the State failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant, Frank G. Spisak, Jr., has been found guilty of committing in the separate counts outweigh the mitigating factors, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court . . . .

(J.A. at 3146-47.) These instructions are virtually identical to those given in *Davis*, which this Court determined are "acquittal-first" jury instructions that failed to instruct the jury "that it need not be unanimous in rejecting the death penalty." *Davis*, 318 F.3d at 689. The *Davis* Court found that not only did these instructions reflect a unanimity requirement, but the verdict form itself also reflected one, in that it had a spot for all twelve signatures under a statement professing that the jury found beyond a reasonable doubt that the aggravating factors did not outweigh the mitigating factors. *Davis*, 318 F.3d at 689.

Similarly, in the present case, the verdict form also reflected a unanimity requirement for a finding that the mitigating factors outweighed the aggravating factors. The trial court told the jury that in order to impose a sentence of death, all twelve had to sign under the statement on the verdict form stating that "we the jury, in this case, being duly impaneled and sworn, do find beyond a reasonable doubt that the aggravating circumstance . . . was sufficient to outweigh the mitigating factors . . . we the jury recommend that the sentence of death be imposed . . . ." (J.A. at 3149.) The trial court further explained the method for using the verdict forms in the following manner:

> There are four separate jury forms for counts five, six and . . . eight. Now, there is also a set of verdict forms, same count numbers, read [sic] as follows:
>
> 'We the jury, being duly impaneled and sworn, do find that the aggravating circumstances which the defendant, Frank G. Spisak, Jr., was found guilty of committing are not sufficient to outweigh the mitigating factors present in this case.
>
> We the jury recommend that the defendant Frank G. Spisak be sentenced to life imprisonment with parol eligibility after serving' – there is an asterisk for a spot on

> the verdict form for you to fill in either 20 or 30 years of imprisonment. And again, all twelve of you must sign whatever verdict it is you arrive at [sic] must be signed in ink.

(J.A. at 3149.) The instructions as to how to acquit for death and impose a life sentence did not differ at all from the instructions as to how to impose death. In explaining the forms, the trial court indicated that all twelve signatures were required to impose a sentence of death, and to acquit for death and impose a life sentence. As we stated in *Davis*, this instruction,

> combined with the jury verdict form, not only 'could' but by its plain language 'would' lead a reasonable juror to conclude that the only way to get a life verdict is if the jury unanimously finds that the aggravating circumstances do not outweigh the mitigating circumstances, an entirely different instruction from one that clearly informs the jurors that a life verdict can be rendered by a jury that has not first unanimously rejected the death penalty. Further adding to the confusion, the jury was never told, either expressly or impliedly, that individual jurors may consider mitigating factors in the weighing process regardless of the lack of agreement with other jurors as to the presence of that factor.

*Davis*, 318 F.3d at 689-90.

In conclusion, we find that the silence on the lack of unanimity required to find mitigating circumstances, the improper "acquittal-first" jury instruction, and the misleading verdict form and instruction as to how to use the verdict form, would have led a jury to apply an unconstitutional unanimity standard at all stages of the deliberative process. *See id* at 690.

## IV.    *Clemons* **Violation**

Defendant next argues that the trial court improperly instructed the jury on multiple aggravating circumstances for each aggravated murder charge. While we agree with Defendant that the jury was improperly instructed, the error was later remedied by the Ohio Supreme Court.

In *Clemons v. Mississippi*, 494 U.S. 738, 741 (1990), the Supreme Court held that the "[f]ederal Constitution does not prevent a state appellate court from upholding a death sentence that is based in part on an invalid or improperly defined aggravating circumstance either by reweighing of the aggravating and mitigating evidence or by harmless-error review." According to the Court,

> Nothing in the Sixth Amendment as construed by our prior decisions indicates that a defendant's right to a jury trial would be infringed where an appellate court invalidates one of two aggravating circumstances found by the jury, but affirms the death sentence after itself finding that the one or more remaining aggravating factors outweigh the mitigating evidence.

*Id*. at 745. "We see no reason to believe that careful appellate weighing of aggravating . . . circumstances in cases such as this would not produce 'measured consistent application' of the death penalty or in any way be unfair to the defendant." *Id*. at 748. During the reweighing process, the state appellate court may not automatically affirm the defendant's death sentence. *Id*. at 752. Rather, the court must give the defendant "an individualized and reliable sentencing determination based on the defendant's circumstances, his background, and the crime." *Id*.at 749. Recently, in *Brown v. Sanders*, 126 S.Ct. 884, 892 (2006), the Supreme Court announced the new rule that:

> An invalidated sentencing factor (whether an eligibility factor or not) will render the sentence unconstitutional by reason of its adding an improper element to the

aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentencer to give aggravating weight to the same facts and circumstances.

The Court's concern in *Brown* was "the skewing that could result from the jury's considering *as aggravation* properly admitted evidence that should not have been weighed in favor of the death penalty," but "such skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." *Id.* (emphasis in original).

Defendant was indicted on four separate counts of aggravated murder, with a total of nineteen specifications. On appeal, the Eighth District Court of Appeals determined that Defendant was improperly convicted of two counts of aggravated murder for the death of Timothy Sheehan, stating that:

> The appellant was indicted on four counts of aggravated murder for the murders of three people. Two counts of aggravated murder, the fifth and sixth counts of the indictment, were for the murder of one individual, Timothy Sheehan. The appellant was subsequently convicted for and sentenced on all four counts of aggravated murder . . . Accordingly while it was proper for the appellant to have been indicted on two separate counts of aggravated murder for the murder of Timothy Sheehan he could only be convicted on one of those counts.

*Spisak*, 1984 WL 13992, at *7. The Eighth District Court of Appeals thus vacated Defendant's conviction on the fifth count of aggravated murder, relating to Sheehan's death, as well as the specifications attached thereto. *Id.* The court of appeals then reweighed the aggravating and mitigating circumstances as they related to the remaining counts and specifications, and upheld the convictions and sentences on those counts. *Id.* at *8. Subsequently, the Ohio Supreme Court noted that the trial court had also failed to merge certain specifications, and held the following:

> Proceeding to our independent weighing of the aggravating circumstances and mitigating factors presented herein, we note that appellant's three aggravated murder convictions specify fifteen separate aggravating circumstances under R.C. 2929.04. However, as pointed out by appellant in his first proposition of law, for purposes of sentencing the doctrine of merger herein applies. Each aggravated murder count should thus contain only one specification that appellant's acts were part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons. R.C. 2929.04(A)(5). Similarly, specifications pursuant to R.C. 2929.04(A)(3) (escaping detection, apprehension, trial or punishment) and R.C. 2929.04(A)(7) (felony murder) are duplicative of and thus merge with R.C. 2929.04(A)(5), since these aggravating circumstances arise from the same indivisible course of conduct. Although the court of appeals did not apply the merger doctrine below, we have determined that the jury's consideration of the duplicative aggravating circumstances during sentencing did not affect their verdict. Furthermore, we have independently determined that the remaining aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

*Spisak*, 521 N.E.2d at 803.

After reviewing the state court proceedings, the district court held, and we agree, that the Ohio Supreme Court did not unreasonably apply federal law in independently reweighing the aggravating and mitigating factors, and upholding Defendant's convictions and sentence. While it is undisputed that the trial court committed error in not merging the death penalty specifications, the Ohio Supreme Court's independent reweighing was sufficient to remedy any error.

It is also clear that after merging the duplicative aggravating circumstances, the Ohio Supreme Court gave the required individualized sentencing determination, *see Clemons*, 494 U.S. at 749, in reweighing Defendant's death sentence:

> Of the mitigating factors specified in R.C. 2929.04(b) appellant relied solely on his allegations that he lacked, due to a mental disease or defect, substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the law at the time of committing the offense. Although there was testimony that appellant had characteristics of borderline and schizotypal personality disorders, the bulk of the testimony, from both defense and rebuttal expert witnesses, established that appellant was sane at the time of the acts, that he could have refrained from committing them, had he so chosen, and that he understood the nature of his acts but elected to carry them out anyway.
>
> Appellant admitted to being the principal offender in three murders and two attempted murders. He did not have a significant history of prior criminal convictions or juvenile adjudications, nor was his age a factor. He was not under duress, coercion or strong provocation at the time of the crimes. His victims neither facilitated nor induced the offense. Nothing in the nature and circumstances of these deliberate murders tempers the gravity of the offenses. We concur with the jury and lower courts that the balance of these factors lies heavily, and beyond reasonable doubts, on the side of the aggravating circumstances of which the appellant was convicted.

*State v. Spisak*, 521 N.E.2d at 803-04 (internal citations omitted). Unlike the case in *Clemons*, this Court can clearly discern that the Ohio Supreme Court did in fact employ the proper method of reweighing the aggravating and mitigating factors before upholding the death sentence. *Clemons*, 494 U.S. at 741.

Moreover, under the recently-decided *Brown* decision, which states that the sentence is unconstitutional unless the jury could give aggravating weight to the same facts and circumstances under one of the other sentencing factors, the reweighing was still sufficient to cure the error where the Ohio Supreme Court merely invalidated some of the specifications because they were duplicative of other specifications that were also considered by the jury. *Brown*, 126 S.Ct. at 892. The jury was able to give aggravating weight to the same facts and circumstances in the remaining murder convictions and death penalty specifications that were properly submitted to the jury.

We thus find that any error related the weighing of aggravating and mitigating factors during the sentencing phase of Defendant's trial was cured by the Ohio Supreme Court's reweighing of the factors, and therefore the Ohio Supreme Court did not violate clearly established federal law in upholding Defendant's death sentence.

## V.          **Prosecutorial Misconduct**

We lastly turn to Defendant's prosecutorial misconduct claim. "In deciding whether prosecutorial misconduct mandates that habeas relief be granted, the Court must apply the harmless error standard." *Macias v. Makowski*, 291 F.3d 447, 451 (6th Cir. 2002) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). The relevant question is whether the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id*. (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). Post-AEDPA, this Court has adopted a two-step test to determine whether prosecutorial misconduct violates a Defendant's due process rights. First, we consider whether the prosecutor's remarks were improper. *Id*. at 452. If we determine that the remarks were improper, then we must "apply the four-factor test

set forth in *United States v. Carroll*, 26 F.3d 1380, 1385 (6th Cir. 1994), to determine 'whether the impropriety was flagrant' and thus violated the defendant's due process rights." *Id*. (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). The four factors to consider are: "(1) whether the conduct and remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the conduct or remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; (4) whether the evidence against the defendant was strong." *Id*.

We must first consider Defendant's allegations of prosecutorial misconduct and determine whether the statements were improper before proceeding to an analysis under the four factors. The district court found that while some of the prosecutor's remarks may have been "repugnant, they did not deny Spisak due process or inject any fundamental unfairness into the trial." (J.A. at 238.) Overall, we agree.

### A.          *Beverly Murphy as a Rebuttal Witness*

First of all, we do not believe that it was improper for the prosecution to call Murphy as a rebuttal witness, but even if it was, none of the testimony elicited from Murphy was at all prejudicial to Defendant. The prosecution called Murphy, over the objection of the defense, to rebut the testimony of Dr. Bertschinger. The district court ruled that Murphy's testimony did not rebut Bertschinger's testimony and that the "trial court erred when it permitted Murphy to testify," but that Defendant was not prejudiced by anything that Murphy said. (J.A. at 236.) We disagree with the district court's conclusion that Murphy's testimony did not constitute rebuttal testimony.

The trial court allowed Murphy to be called as a rebuttal witness over the defense's objection because the prosecution had asked Bertschinger questions about the relationship that Defendant, a self-professed Nazi supporter and white supremacist, claims to have had with Murphy, an African-American prostitute. Bertschinger opined that Defendant had a romantic relationship with Murphy, which reflected his personality disorder, given his alleged hatred of African-Americans. In response, the prosecution called Murphy who contradicted this characterization of her relationship with Defendant, testifying that the relationship was nothing more than a business relationship. Murphy testified extensively about the frequency and manner in which Defendant compensated her for sexual services, which included giving her guns. This testimony was appropriate to rebut Bertschinger's contention that Defendant had a romantic relationship with Murphy.

Regardless, however, of whether the testimony was in fact rebuttal, we agree with the district court that even if the testimony was inappropriate, it was not, under the first of the four *Carter* factors, prejudicial to Defendant. Murphy did not reveal anything new that the jury had not heard before, and her testimony was not inflammatory or damaging to Defendant. She merely recounted facts that the jury had already heard, and offered her perspective that she and Defendant's relationship was nothing more than a business arrangement. Further, much of the testimony that Defendant challenges, was actually given in response to defense counsel's questioning on cross-examination. We therefore conclude that Murphy's testimony did not render Defendant's trial fundamentally unfair.

### B.          *Improper Remarks During The Mitigation Phase*

Defendant next claims that the prosecutor made improper comments during its cross-examination of Bertschinger during the mitigation phase of the trial. Again, we find this claim to be without merit. First Defendant argues that the prosecutor improperly described him as a whore, but the record reveals that while the prosecutor did refer to Defendant's homosexual prostitution, he did not use the term whore. Moreover, these remarks were in reference to Bertschinger's testimony that Defendant admitted engaging in homosexual prostitution, and that these activities

contributed to the dissolution of Defendant's marriage. These comments were therefore not improper.

It was also not improper for the prosecution to make reference to Dr. Markey's stricken testimony where defense counsel "opened the door" to this questioning by addressing Markey's report on direct examination. Defendant also claims that the prosecution improperly stated that Defendant "wanted to be a pimp," but the record reveals that the question was posed to Bertschinger as part of a discussion of Defendant's tendency to date black prostitutes and have them live in his home. Again, we do not believe that the remark was improper since it was only a passing reference and was posed as a legitimate question; but even if it was improper, we still find that any potential prejudice would have been minimal and would not have impacted the fundamental fairness of the trial.

We also do not believe that Defendant was prejudiced by any of the prosecutor's remarks during the prosecution's closing arguments of the mitigation phase of the trial. The prosecutor's argument was devoted to demonstrating that Defendant's personality disorder did not outweigh his culpability for the murders he had committed, and that Defendant's actions were voluntary and he knew what he was doing when he committed the crimes. Out of thirty-three pages of argument, Defendant points to a few isolated comments to try to establish that his due process rights were violated. Defendant points out that the prosecution accused him of fabricating testimony; of being unwilling to support his wife; characterized Defendant as having no remorse; characterized the expert testimony as insulting and being mumbo jumbo; likened Defendant to a rat who hides in the basement; commented that Defendant would not have pled not guilty by reason of insanity if two of the witnesses had not survived; and asked the jury "how many people does he have to kill before we say enough is enough." None of these minimal, isolated remarks, even if improper, prejudiced Defendant or rendered his trial fundamentally unfair.

### C.        *Cross-Examination of Defendant*

Lastly, Defendant argues that the prosecution committed misconduct during his cross-examination by questioning Defendant about his bizarre political and religious beliefs, his receipt of public assistance, his failure to support his family, his homosexuality, his activities as a male prostitute, and treatment of his wife. Again, we find this argument to be without merit where the record reveals that the majority of these issues were in fact raised by Defendant's trial counsel during direct examination. Trial counsel's direct examination of Defendant focused on Defendant's political and religious beliefs, associations with Nazis, hatred of blacks and Jews, and how those hatreds drove him to the killings. Defendant also testified on direct about his homosexual activity, cross-dressing, and consideration of a sex change operation. Defendant further testified that he could not recall the reasons for his divorce, but that he continued to support his wife and daughter afterward. As these matters were addressed on direct, they were the proper subject of cross-examination.

We therefore conclude that the district court properly found that there was no prosecutorial misconduct that denied Defendant due process or injected any fundamental unfairness into Defendant's trial.

### CONCLUSION

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part. We **AFFIRM** the judgment of the district court as it relates to issues I, IV, and V, but we **REVERSE** the district court's judgment as to issues II and III, and **REMAND** with instructions to grant the Writ as to issues II and III. Accordingly, we deny habeas relief with respect to the determination of Defendant's guilt, but remand for a new mitigation phase trial.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part and dissenting in part. I concur in the majority opinion, except for its treatment of Issue 1, Spisak's insanity defense. I believe that the trial court's exclusion of expert testimony and evidence regarding Spisak's insanity defense and the trial court's refusal to submit the insanity defense to the jury violated Spisak's rights to a fair trial and to present a complete defense, rights long recognized by the Supreme Court. Therefore I would remand this case to the district court with instructions to grant a conditional writ of habeas corpus, giving the State of Ohio 180 days to retry Spisak or release him from custody.

Spisak claims that he was legally insane because of a severe personality disorder (which manifested itself with the bizarre and seemingly inconsistent beliefs and behaviors including racial and ethnic hatred and sexual deviance) and that he was entitled to present evidence of his insanity cumulatively, rather than needing to produce a singular expert who could testify to both prongs of the Ohio insanity standard.

In order to succeed on his affirmative insanity defense, Spisak needed to "establish by a preponderance of the evidence that disease or other defect of his mind had so impaired his reason that, at the time of the criminal act with which he is charged, either he did not know that such act was wrong or he did not have the ability to refrain from doing that act." *State v. Staten*, 247 N.E.2d 293, 299 (Ohio 1969) (footnote omitted). When insanity is pleaded as a defense, and the evidence is such that "reasonable minds may reach different conclusions upon the question of insanity, such question of fact is for the jury." *State v. Gaines*, 318 N.E.2d 857, 864 (Ohio Ct. App. 1974) (internal quotation marks omitted). "If, however, after giving the evidence the most favorable interpretation in favor of the defendant, reasonable minds can come to but one conclusion and that conclusion [is] adverse to defendant, it is the court's duty to rule on the issue as a matter of law." *Id.* (internal quotation marks omitted).

Spisak argues that "although none of the defense experts were prepared to specifically conclude that Spisak was legally insane, their testimony was being presented as relevant and material to specific *elements* of the insanity defense, from which the defense thereby hoped to meet the burden of proof supporting an insanity defense."[1] Appellant Br. at 20. Spisak is correct that cumulatively, his psychiatric experts did provide support for the necessary insanity elements. In his report on the issue of sanity at the time of the act, Dr. Bertschinger stated that it was his opinion that "Mr. Spisak's personality deficits are of such severity that he can be considered to have a mental illness or mental disease." J.A. at 3217 (Bertschinger Rep. at 2). Dr. Markey's report and proffered testimony supported Spisak's claim that he was unable to refrain from committing the criminal acts. J.A. at 3192 (Markey Rep. at 3) ("I believe Spisak is in a latent psychosis (grandiose, paranoid, lacking in finer feelings, etc.) and that he was unable to control his impulses to assault, though he was at the time, aware of it's being socially wrong."); J.A. at 2082 ("I would say that [Spisak] was aware [that his actions broke the law], and he was unable to change his actions even though he knew that he was doing something that was against the law."); J.A. at 2083 (agreeing that Spisak's personality disorder was of such gravity that he would not be able to conform his conduct to the requirements of the law). Markey wavered on cross examination on his opinion that Spisak could

---

[1] I have been unable to find any Ohio cases that address this cumulative approach to establishing an insanity defense. It appears that the Ohio courts have neither recognized nor rejected this method of meeting the defendant's evidentiary burden.

not control his actions, but then on redirect restated that he believed Spisak was unable to control his impulse to assault. J.A. at 2093-97 (Trial Tr. at 1992-96).

Under the *Gaines* standard above, when giving Spisak's expert evidence the interpretation most favorable to Spisak, I conclude that reasonable minds could reach different conclusions about his sanity. Therefore, the issue of Spisak's insanity should have been submitted to the jury to allow it to consider his insanity defense. *See Mathews v. United States*, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."). I also believe that Spisak's argument that the Supreme Court of Ohio's perfunctory dismissal of this claim was an unreasonable application of federal constitutional law has merit. The Supreme Court has recognized the essential nature of expert testimony in presenting an insanity defense, holding that due process requires that indigent defendants be afforded the assistance of a psychiatrist in preparing a defense. *Ake v. Oklahoma*, 470 U.S. 68, 81 (1985) (stating that "the testimony of psychiatrists can be crucial and 'a virtual necessity if an insanity plea is to have any chance of success.'") (footnote omitted). Furthermore, while most violations of state law are not sufficient to justify habeas relief, "[w]hen an evidentiary ruling is so egregious that it results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). Adverse evidentiary rulings by state courts do not harm a defendant's due process rights unless they "offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Montana v. Egelhoff,* 518 U.S. 37, 43 (1996) (internal quotation marks omitted). The Supreme Court has repeatedly held, however, that a criminal defendant's right to present a defense, including presenting witnesses on his behalf, is a fundamental right. *See Washington v. Texas*, 388 U.S. 14, 19 (1967) ("Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a *fundamental element* of due process of law.") (emphasis added); *California v. Trombetta*, 467 U.S. 479, 485 (1984) ("We have long interpreted this standard of [fundamental] fairness to require that criminal defendants be afforded a *meaningful opportunity* to present a *complete* defense.") (emphasis added); *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("Few rights are more fundamental than that of an accused to present witnesses in his own defense."). In this case, Spisak argues he was unable to present expert evidence about his significant mental health problems, thereby limiting his fundamental right to present a complete defense.

In addition, clearly established Supreme Court precedent holds that a state violates a defendant's right to a fair trial when it prevents him from introducing evidence essential to his defense. *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (concluding that the state court's refusal to allow the defendant to introduce testimony regarding the circumstances in which he confessed to the police deprived him of a fair trial); *Chambers*, 410 U.S. at 302 (holding that the state court's exclusion of evidence critical to defendant's defense, coupled with the refusal of the state to let the defendant cross examine a witness, denied him due process). In *Chambers*, the defendant argued that the state court violated his constitutional rights when it rejected potentially exculpatory witness testimony because it was hearsay not meeting any recognized exceptions. The *Chambers* Court acknowledged the need for defendants wishing to present evidence to comply with a state's "established rules of procedure and evidence," and stated that "perhaps no rule of evidence has been more respected or more frequently applied in jury trials" than the hearsay rule. *Id*. at 302. Nevertheless, because the evidence proffered by the defense "bore persuasive assurances of trustworthiness" and "also was critical to [the defendant's] defense," the Court concluded that the defendant's constitutional rights required its admission. *Id*. The Court stated, "[i]n these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice." *Id*.

In *Crane*, the Supreme Court also held that state evidentiary rules must sometimes give way to a defendant's constitutional rights. The Court stated that a defendant's constitutional right to be heard "is an empty one if the State were permitted to exclude competent, reliable evidence . . . when such evidence is central to the defendant's claim of innocence." *Crane*, 476 U.S. at 690. The *Crane* Court recognized the traditional respect afforded to the states in determining their own criminal trial procedures and rules. Notwithstanding the Court's "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts," the Court held, "we have little trouble concluding on the facts of this case that the *blanket exclusion* of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." *Id*. at 689-90 (emphasis added). The Court stated, the "[p]etitioner's *entire defense* was that there was no physical evidence to link him to the crime and that, for a variety of reasons, his earlier admission of guilt was not to be believed." *Id*. at 691 (emphasis added). The Court noted that it was not passing judgment "on the strength or merits of that defense," but that it thought "it plain that introducing evidence of the physical circumstances that yielded the confession *was all but indispensable to any chance* of [the defense] succeeding." *Id*. (emphasis added).

Here, Spisak's expert evidence (including Markey's testimony and the reports prepared by Bertschinger and the other experts) was as integral to Spisak's entire defense as was the hearsay evidence in *Chambers* and the confession evidence in *Crane*. Here the trial court mechanistically applied the evidentiary relevancy standard, resulting in the "blanket exclusion of the proffered testimony" of experts relating to his mental health. *Crane*, 476 U.S. at 690. Spisak's "entire defense" was that he was legally insane and therefore did not possess the culpability necessary to commit the murders, and it is "plain" that his ability to introduce expert evidence of his mental problems was "indispensable" if his insanity defense was going to have any chance of succeeding. *Id*. at 691. The proffered expert evidence also appears to meet the levels of reliability that the Court demanded in *Chambers* and *Crane*. Spisak's expert testimony came from "competent, reliable" psychiatric and psychological experts repeatedly relied upon by the Ohio courts, *Crane*, 476 U.S. at 690, and it "bore persuasive assurances of trustworthiness." *Chambers*, 476 U.S. at 302. The evidence would have been subject to cross examination by prosecutors, allowing them ample opportunity to point out the numerous conclusions contrary to Spisak's insanity defense. Yet without this evidence, the question of Spisak's sanity never even reached the jury. In light of these Supreme Court precedents holding that a defendant must be allowed to present evidence critical to his defense, I would conclude that the Supreme Court of Ohio's summary rejection of Spisak's claim was an unreasonable application of clearly established Supreme Court precedent. I would remand this case to the district court with instructions to grant a conditional writ of habeas corpus, giving the State of Ohio 180 days to retry Spisak or release him from custody.