(Slip Opinion) OCTOBER TERM, 2009 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SMITH, WARDEN *v.* SPISAK

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 08–724. Argued October 13, 2009—Decided January 12, 2010

After the Ohio courts sentenced respondent Spisak to death and denied
his claims on direct appeal and collateral review, he filed a federal
habeas petition claiming that, at his trial's penalty phase, (1) the in-
structions and verdict forms unconstitutionally required the jury to
consider in mitigation *only* those factors that it *unanimously* found to
be mitigating, see *Mills* v. *Maryland*, 486 U. S. 367, and (2) his coun-
sel's inadequate closing argument deprived him of effective assis-
tance of counsel, see *Strickland* v. *Washington*, 466 U. S. 668. The
District Court denied the petition, but the Sixth Circuit accepted both
arguments and ordered relief.

*Held:*

1. Because the state court's upholding of the mitigation jury in-
structions and forms was not "contrary to, or . . . an unreasonable ap-
plication of, clearly established Federal law, as determined by [this]
Court," 28 U. S. C. §2254(d)(1), the Sixth Circuit was barred from
reaching a contrary decision. The Court of Appeals erred in holding
that the instructions and forms contravened *Mills*, in which this
Court held that the jury instructions and verdict forms at issue vio-
lated the Constitution because, read naturally, they told the jury that
it could not find a particular circumstance to be mitigating unless all
12 jurors agreed that the mitigating circumstance had been proved to
exist, 486 U. S., at 380–381, 384. Even assuming that *Mills* sets
forth the pertinent "clearly established Federal law" for reviewing the
state-court decision in this case, the instructions and forms used here
differ significantly from those in *Mills:* They made clear that, to rec-
ommend a death sentence, the jury had to find unanimously that
each of the aggravating factors outweighed any mitigating circum-
stances, but they did not say that the jury had to determine the exis-

tence of each individual mitigating factor unanimously.  Nor did they
say anything about how—or even whether—the jury should make in-
dividual determinations that each particular mitigating circumstance
existed.  They focused only on the overall question of balancing the
aggravating and mitigating factors, and they repeatedly told the jury
to consider all relevant evidence.  Thus, the instructions and verdict
forms did not clearly bring about, either through what they said or
what they implied, the constitutional error in the *Mills* instructions.
Pp. 2–9.

  2. Similarly, the state-court decision rejecting Spisak's ineffective-
assistance-of-counsel claim was not "contrary to, or . . . an unreason-
able application" of the law "clearly established" in *Strickland.*
§2254(d)(1).  To prevail on this claim, Spisak must show, *inter alia,*
that there is a "reasonable probability that, but for counsel's unpro-
fessional errors, the result of the proceeding would have been differ-
ent." *Strickland, supra,* at 694.  Even assuming that the closing ar-
gument was inadequate in the respects claimed by Spisak, this Court
finds no "reasonable probability" that a better closing argument
without these defects would have made a significant difference.  Any
different, more adequate closing argument would have taken place in
the following context: Spisak's defense at the trial's guilt phase con-
sisted of an effort by counsel to show that Spisak was not guilty by
reason of insanity.   Counsel, apparently hoping to demonstrate
Spisak's mentally defective condition, called him to the stand, where
he freely admitted committing three murders and two other shoot-
ings and repeatedly expressed an intention to commit further mur-
ders if given the opportunity.  In light of this background and for the
following reasons, the assumed closing argument deficiencies do not
raise the requisite reasonable probability of a different result but for
the deficient closing.  First, since the sentencing phase took place
immediately after the guilt phase, the jurors had fresh in their minds
the government's extensive and graphic evidence regarding the kill-
ings, Spisak's boastful and unrepentant confessions, and his threats
to commit further violent acts.  Second, although counsel did not
summarize the mitigating evidence in great detail, he did refer to it,
and the defense experts' more detailed testimony regarding Spisak's
mental illness was also fresh in the jurors' minds.  Third, Spisak does
not describe what other mitigating factors counsel might have men-
tioned; all those he proposes essentially consist of aspects of the
"mental defect" factor that the defense experts described.  Finally, in
light of counsel's several appeals to the jurors' sense of humanity, it
is unlikely that a more explicit or elaborate appeal for mercy could
have changed the result, either alone or together with the foregoing
circumstances.   The Court need not reach Spisak's claim that

Syllabus

§2254(d)(1) does not apply to his claim, because it would reach the same conclusion even on *de novo* review. Pp. 9–16.

512 F. 3d 852, reversed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, GINSBURG, ALITO, and SO-TOMAYOR, JJ., joined, and in which STEVENS, J., joined as to Part III. STEVENS, J., filed an opinion concurring in part and concurring in the judgment.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

### No. 08–724

### KEITH SMITH, WARDEN, PETITIONER *v.* FRANK G. SPISAK, JR.

#### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

#### [January 12, 2010]

JUSTICE BREYER delivered the opinion of the Court.

Frank G. Spisak, Jr., the respondent, was convicted in an Ohio trial court of three murders and two attempted murders. He was sentenced to death. He filed a habeas corpus petition in federal court, claiming that constitutional errors occurred at his trial. First, Spisak claimed that the jury instructions at the penalty phase unconstitutionally required the jury to consider in mitigation *only* those factors that the jury *unanimously* found to be mitigating. See *Mills* v. *Maryland*, 486 U. S. 367 (1988). Second, Spisak claimed that he suffered significant harm as a result of his counsel's inadequate closing argument at the penalty phase of the proceeding. See *Strickland* v. *Washington*, 466 U. S. 668 (1984). The Federal Court of Appeals accepted these arguments and ordered habeas relief. We now reverse the Court of Appeals.

## I

In 1983, an Ohio jury convicted Spisak of three murders and two attempted murders at Cleveland State University in 1982. The jury recommended, and the judge imposed, a death sentence. The Ohio courts denied Spisak's claims,

both on direct appeal and on collateral review. *State* v. *Spisak*, 36 Ohio St. 3d 80, 521 N. E. 2d 800 (1988) *(per curiam); State* v. *Spisak*, No. 67229, 1995 WL 229108 (Ohio App., 8th Dist., Cuyahoga Cty., Apr. 13, 1995); *State* v. *Spisak*, 73 Ohio St. 3d 151, 652 N. E. 2d 719 (1995) *(per curiam).*

Spisak then sought a federal writ of habeas corpus. Among other claims, he argued that the sentencing phase of his trial violated the U. S. Constitution for the two reasons we consider here. The District Court denied his petition. *Spisak* v. *Coyle*, Case No. 1:95CV2675 (ND Ohio, Apr. 18, 2003), App. to Pet. for Cert. 95a. But the Court of Appeals accepted Spisak's two claims, namely, his mitigation instruction claim and his ineffective-assistance-of-counsel claim. *Spisak* v. *Mitchell*, 465 F. 3d 684, 703–706, 708–711 (CA6 2006). The Court of Appeals consequently ordered the District Court to issue a conditional writ of habeas corpus forbidding Spisak's execution. *Id.,* at 715–716.

The State of Ohio then sought certiorari in this Court. We granted the petition and vacated the Court of Appeals' judgment. *Hudson* v. *Spisak*, 552 U. S. 945 (2007). We remanded the case for further consideration in light of two recent cases in which this Court had held that lower federal courts had not properly taken account of the deference federal law grants state-court determinations on federal habeas review. *Ibid.;* see 28 U. S. C. §2254(d); *Carey* v. *Musladin*, 549 U. S. 70 (2006); *Schriro* v. *Landrigan*, 550 U. S. 465 (2007). On remand, the Sixth Circuit reinstated its earlier opinion. *Spisak* v. *Hudson*, 512 F. 3d 852, 853–854 (2008). The State again sought certiorari. We again granted the petition. And we now reverse.

## II

Spisak's first claim concerns the instructions and verdict forms that the jury received at the sentencing phase of his

trial.  The Court of Appeals held the sentencing instruc-
tions unconstitutional because, in its view, the instruc-
tions, taken together with the forms, "require[d]" juror
"unanimity as to the presence of a mitigating factor"—
contrary to this Court's holding in *Mills* v. *Maryland*,
*supra.*  465 F. 3d, at 708.  Since the parties do not dispute
that the Ohio courts "adjudicated" this claim, *i.e.*, they
considered and rejected it "on the merits," the law permits
a federal court to reach a contrary decision only if the
state-court decision "was contrary to, or involved an un-
reasonable application of, clearly established Federal law,
as determined by the Supreme Court of the United
States."  28 U. S. C. §2254(d)(1).  Unlike the Court of
Appeals, we conclude that Spisak's claim does not satisfy
this standard.

The parties, like the Court of Appeals, assume that
*Mills* sets forth the pertinent "clearly established Federal
law."  While recognizing some uncertainty as to whether
*Mills* was "clearly *established* Federal law" for the purpose
of reviewing the Ohio Supreme Court's opinion, we shall
assume the same.  Compare *Williams* v. *Taylor*, 529 U. S.
362, 390 (2000) (STEVENS, J., for the Court) (applicable
date for purposes of determining whether "Federal law" is
"established" is when the "state-court conviction became
final"), with *id.,* at 412 (O'Connor, J., for the Court) (appli-
cable date is "the time of the relevant state-court deci-
sion"); see *State* v. *Spisak*, 36 Ohio St. 3d 80, 521 N. E. 2d
800 (decided Apr. 13, 1988), cert. denied, 489 U. S. 1071
(decided Mar. 6, 1989); *Mills* v. *Maryland, supra* (decided
June 6, 1988).

## A

The rule the Court set forth in *Mills* is based on two
well-established principles.  First, the Constitution forbids
imposition of the death penalty if the sentencing judge or
jury is "'"precluded from considering, *as a mitigating*

*factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."'" 486 U. S., at 374 (quoting *Eddings* v. *Oklahoma*, 455 U. S. 104, 110 (1982), in turn quoting *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion)). Second, the sentencing judge or jury "'may not refuse to consider *or be precluded from considering* "any relevant mitigating evidence."'" *Mills*, 486 U. S., at 374–375 (quoting *Skipper* v. *South Carolina*, 476 U. S. 1, 4 (1986), in turn quoting *Eddings*, *supra,* at 114).

Applying these principles, the Court held that the jury instructions and verdict forms at issue in the case violated the Constitution because, read naturally, they told the jury that it could not find a particular circumstance to be mitigating unless all 12 jurors agreed that the mitigating circumstance had been proved to exist. *Mills*, 486 U. S., at 380–381, 384. If, for example, the defense presents evidence of three potentially mitigating considerations, some jurors may believe that only the first is mitigating, some only the second, and some only the third. But if even *one* of the jurors believes that one of the three mitigating considerations exists, but that he is barred from considering it because the other jurors disagree, the Court held, the Constitution forbids imposition of the death penalty. See *id.,* at 380, 384; see also *McKoy* v. *North Carolina*, 494 U. S. 433, 442–443 (1990) ("*Mills* requires that each juror be permitted to consider and give effect to . . . all mitigating evidence in deciding . . . whether aggravating circumstances outweigh mitigating circumstances . . . "). Because the instructions in *Mills* would have led a reasonable juror to believe the contrary, the Court held that the sentencing proceeding violated the Constitution. 486 U. S., at 374–375.

### B

In evaluating the Court of Appeals' determination here, we have examined the jury instructions and verdict forms at issue in *Mills* and compared them with those used in the present case. In the *Mills* sentencing phase, the trial judge instructed the jury to fill out a verdict form that had three distinct parts. Section I set forth a list of 10 specific aggravating circumstances next to which were spaces where the jury was to mark "yes" or "no." Just above the list, the form said:

> "Based upon the evidence we *unanimously* find that each of the following aggravating circumstances which is marked 'yes' has been proven . . . and each aggravating circumstance which is marked 'no' has not been proven . . . ." 486 U. S., at 384–385 (emphasis added; internal quotation marks omitted).

Section II set forth a list of eight potentially mitigating circumstances (seven specific circumstances and the eighth designated as "other") next to which were spaces where the jury was to mark "yes" or "no." Just above the list the form said:

> "Based upon the evidence we *unanimously* find that each of the following mitigating circumstances which is marked 'yes' has been proven to exist . . . and each mitigating circumstance marked 'no' has not been proven . . . ." *Id.,* at 387 (emphasis added; internal quotation marks omitted).

Section III set forth the overall balancing question, along with spaces for the jury to mark "yes" or "no." It said:

> "Based on the evidence we *unanimously* find that it has been proven . . . that the mitigating circumstances marked 'yes' in Section II outweigh the aggravating circumstances marked 'yes' in Section I." *Id.,* at 388–389 (emphasis added; internal quotation marks omit-

ted).

Explaining the forms, the judge instructed the jury with an example. He told the jury that it should mark "'yes'" on the jury form if it "'unanimously'" concluded that an aggravating circumstance had been proved. *Id.,* at 378. Otherwise, he said, "'of course you must answer no.'" *Ibid.* (emphasis deleted). These instructions, together with the forms, told the jury to mark "yes" on Section II's list of mitigating factors only if the jury unanimously concluded that the particular mitigating factor had been proved, and to consider in its weighing analysis in Section III only those mitigating factors marked "yes" in Section II. Thus, as this Court found, the jury was instructed that it could consider in the ultimate weighing of the aggravating and mitigating evidence only the mitigating factors that the jury had *unanimously* found to exist. See *id.,* at 380–381.

The instructions and jury forms in this case differ significantly from those in *Mills.* The trial judge instructed the jury that the aggravating factors they would consider were the specifications that the jury had found proved beyond a reasonable doubt at the guilt phase of the trial— essentially, that each murder was committed in a course of conduct including the other crimes, and, for two of the murders, that the murder was committed with the intent to evade apprehension or punishment for another offense. 8 Tr. 2967–2972 (July 19, 1983).

He then explained the concept of a "mitigating factor." After doing so, he listed examples, including that "the defendant because of a mental disease or defect . . . lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." *Id.,* at 2972–2973. The court also told the jury that it could take account of "any other" mitigating consideration it found "relevant to the issue of whether the

defendant should be sentenced to death." *Id.*, at 2973. And he instructed the jury that the State bore the burden of proving beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. *Id.*, at 2965.

With respect to "the procedure" by which the jury should reach its verdict, the judge told the jury only the following:

> "[Y]ou, the trial jury, must consider all of the relevant evidence raised at trial, the evidence and testimony received in this hearing and the arguments of counsel. From this you must determine whether, beyond a reasonable doubt, the aggravating circumstances, which [Spisak] has been found guilty of committing in the separate counts are sufficient to outweigh the mitigating factors present in this case.
>
> "If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstance in each separate count outweighs the mitigating factors, then you must return that finding to the Court.
>
> .          .          .          .          .
>
> "On the other hand, if after considering all of the relevant evidence raised at trial, the evidence and the testimony received at this hearing and the arguments of counsel, you find that the State failed to prove beyond a reasonable doubt that the aggravating circumstances which [Spisak] has been found guilty of committing in the separate counts outweigh the mitigating factors, you will then proceed to determine which of two possible life imprisonment sentences to recommend to the Court." *Id.*, at 2973–2975.

The judge gave the jury two verdict forms for each aggravating factor. The first of the two forms said:

> "'We the jury in this case . . . do find beyond a reasonable doubt that the aggravating circumstance . . . was

sufficient to outweigh the mitigating factors present
in this case.

"'We the jury recommend that the sentence of death
be imposed . . . .'" *Id.*, at 2975–2976.

The other verdict form read:

"'We the jury . . . do find that the aggravating circum-
stances . . . are not sufficient to outweigh the mitiga-
tion factors present in this case.

"'We the jury recommend that the defendant . . . be
sentenced to life imprisonment . . . .'" *Id.*, at 2976.

The instructions and forms made clear that, to recom-
mend a death sentence, the jury had to find, unanimously
and beyond a reasonable doubt, that each of the aggravat-
ing factors outweighed any mitigating circumstances. But
the instructions did not say that the jury must determine
the existence of each individual mitigating factor unani-
mously. Neither the instructions nor the forms said any-
thing about how—or even whether—the jury should make
individual determinations that each particular mitigating
circumstance existed. They focused only on the overall
balancing question. And the instructions repeatedly told
the jury to "conside[r] all of the relevant evidence." *Id.*, at
2974. In our view the instructions and verdict forms did
not clearly bring about, either through what they said or
what they implied, the circumstance that *Mills* found
critical, namely,

"a substantial possibility that reasonable jurors, upon
receiving the judge's instructions in this case, and in
attempting to complete the verdict form as instructed,
well may have thought they were precluded from con-
sidering any mitigating evidence unless all 12 jurors
agreed on the existence of a particular such circum-
stance." 486 U. S., at 384.

We consequently conclude that that the state court's deci-

sion upholding these forms and instructions was not "contrary to, or . . . an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" in *Mills.* 28 U. S. C. §2254(d)(1).

We add that the Court of Appeals found the jury instructions unconstitutional for an additional reason, that the instructions "require[d] the jury to unanimously reject a death sentence before considering other sentencing alternatives." 465 F. 3d, at 709 (citing *Maples* v. *Coyle*, 171 F. 3d 408, 416–417 (CA6 1999)). We have not, however, previously held jury instructions unconstitutional for this reason. *Mills* says nothing about the matter. Neither the parties nor the courts below referred to *Beck* v. *Alabama*, 447 U. S. 625 (1980), or identified any other precedent from this Court setting forth this rule. Cf. *Jones* v. *United States*, 527 U. S. 373, 379–384 (1999) (rejecting an arguably analogous claim). But see *post*, at 3–5 (STEVENS, J., concurring in part and concurring in judgment). Whatever the legal merits of the rule or the underlying verdict forms in this case were we to consider them on direct appeal, the jury instructions at Spisak's trial were not contrary to "clearly established Federal law." 28 U. S. C. §2254(d)(1).

## III

Spisak's second claim is that his counsel's closing argument at the sentencing phase of his trial was so inadequate as to violate the Sixth Amendment. To prevail, Spisak must show both that "counsel's representation fell below an objective standard of reasonableness," *Strickland*, 466 U. S., at 688, and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.,* at 694.

The Ohio Supreme Court held that Spisak's claim was

"not well-taken on the basis of our review of the record." *State* v. *Spisak*, 36 Ohio St. 3d, at 82, 521 N. E. 2d, at 802 (citing, *inter alia, Strickland*, *supra*). The District Court concluded that counsel did a constitutionally adequate job and that "[t]here simply is not a reasonable probability that, absent counsel's alleged errors, the jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Spisak* v. *Coyle*, App. to Pet. for Cert. 204a. The Court of Appeals, however, reached a contrary conclusion. It held that counsel's closing argument, measured by "'an objective standard of reasonableness,'" was inadequate, and it asserted that "a reasonable probability exists" that adequate representation would have led to a different result. 465 F. 3d, at 703, 706 (quoting *Strickland*, *supra*, at 688). Responding to the State's petition for certiorari, we agreed to review the Court of Appeals' terse finding of a "reasonable probability" that a more adequate argument would have changed a juror's vote.

In his closing argument at the penalty phase, Spisak's counsel described Spisak's killings in some detail. He acknowledged that Spisak's admiration for Hitler inspired his crimes. He portrayed Spisak as "sick," "twisted," and "demented." 8 Tr. 2896 (July 19, 1983). And he said that Spisak was "never going to be any different." *Ibid.* He then pointed out that all the experts had testified that Spisak suffered from some degree of mental illness. And, after a fairly lengthy and rambling disquisition about his own decisions about calling expert witnesses and preparing them, counsel argued that, even if Spisak was not legally insane so as to warrant a verdict of not guilty by reason of insanity, he nonetheless was sufficiently mentally ill to lessen his culpability to the point where he should not be executed. Counsel also told the jury that, when weighing Spisak's mental illness against the "substantial" aggravating factors present in the case, *id.*, at

2924, the jurors should draw on their own sense of "pride" for living in "a humane society" made up of "a humane people," *id.*, at 2897–2900, 2926–2928. That humanity, he said, required the jury to weigh the evidence "fairly" and to be "loyal to that oath" the jurors had taken to up-hold the law. *Id.*, at 2926.

Spisak and his supporting *amici* say that this argument was constitutionally inadequate because: (1) It overly emphasized the gruesome nature of the killings; (2) it overly emphasized Spisak's threats to continue his crimes; (3) it understated the facts upon which the experts based their mental illness conclusions; (4) it said little or nothing about any other possible mitigating circumstance; and (5) it made no explicit request that the jury return a verdict against death.

We assume for present purposes that Spisak is correct that the closing argument was inadequate. We neverthe-less find no "reasonable probability" that a better closing argument without these defects would have made a sig-nificant difference.

Any different, more adequate closing argument would have taken place in the following context: Spisak admitted that he had committed three murders and two other shoot-ings. Spisak's defense at the guilt phase of the trial con-sisted of an effort by counsel to show that Spisak was not guilty by reason of insanity. And counsel, apparently hoping to demonstrate Spisak's mentally defective condi-tion, called him to the stand.

Spisak testified that he had shot and killed Horace Rickerson, Timothy Sheehan, and Brian Warford. He also admitted that he had shot and tried to kill John Har-daway, and shot at Coletta Dartt. He committed these crimes, he said, because he was a follower of Adolf Hitler, who was Spisak's "spiritual leader" in a "war" for "sur-vival" of "the Aryan people." 4 *id.*, at 1343–1344, 1396 (July 5, 1983). He said that he had purchased guns and

stockpiled ammunition to further this war. *Id.*, at 1406–
1408. And he had hoped to "create terror" at Cleveland
State University, because it was "one of the prime targets"
where the "Jews and the system . . . are brainwashing the
youth." *Id.*, at 1426–1428.

Spisak then said that in February 1982 he had shot
Rickerson, who was black, because Rickerson had made a
sexual advance on Spisak in a university bathroom. He
expressed satisfaction at having "eliminated that particu-
lar threat . . . to me and to the white race." 5 *id.*, at 1511
(July 7, 1983). In June he saw a stranger, John Har-
daway, on a train platform and shot him seven times
because he had been looking for a black person to kill as
"blood atonement" for a recent crime against two white
women. 4 *id.*, at 1416 (July 5, 1983). He added that he
felt "good" after shooting Hardaway because he had "ac-
complished something," but later felt "[k]ind of bad" when
he learned that Hardaway had survived. *Id.*, at 1424–
1425. In August 1982, Spisak shot at Coletta Dartt be-
cause, he said, he heard her "making some derisive re-
marks about us," meaning the Nazi Party. *Id.*, at 1432–
1435. Later that August, he shot and killed Timothy
Sheehan because he "thought he was one of those Jewish
professors . . . that liked to hang around in the men's room
and seduce and pervert and subvert the young people that
go there." 5 *id.*, at 1465–1466 (July 7, 1983). Spisak
added that he was "sorry about that" murder because he
later learned Sheehan "wasn't Jewish like I thought he
was." *Ibid.* And three days later, while on a "search and
destroy mission," he shot and killed Brian Warford, a
young black man who "looked like he was almost asleep"
in a bus shelter, to fulfill his "duty" to "inflict the maxi-
mum amount of casualties on the enemies." *Id.*, at 1454–
1455, 1478.

Spisak also testified that he would continue to commit
similar crimes if he had the chance. He said about War-

ford's murder that he "didn't want to get caught that time because I wanted to be able to do it again and again and again and again." *Id.*, at 1699 (July 8, 1983). In a letter written to a friend, he called the murders of Rickerson and Warford "the finest thing I ever did in my whole life" and expressed a wish that he "had a human submachine gun right now so I could exterminate" black men "and watch them scream and twitch in agony." *Id.*, at 1724–1725. And he testified that, if he still had his guns, he would escape from jail, "go out and continue the war I started," and "continue to inflict the maximum amount of damage on the enemies as I am able to do." *Id.*, at 1780–1781.

The State replied by attempting to show that Spisak was lying in his testimony about the Nazi-related motives for these crimes. The State contended instead that the shootings were motivated by less unusual purposes, such as robbery. See *id.*, at 1680, 1816–1818.

The defense effort to show that Spisak was not guilty by reason of insanity foundered when the trial judge refused to instruct the jury to consider that question and excluded expert testimony regarding Spisak's mental state. The defense's expert witness, Dr. Oscar Markey, had written a report diagnosing Spisak as suffering from a "schizotypal personality disorder" and an "atypical psychotic disorder," and as, at times, "unable to control his impulses to assault." 6 *id.*, at 1882–1883, 1992 (July 11, 1983). His testimony was somewhat more ambiguous during a *voir dire*, however. On cross-examination, he conceded that he could not say Spisak failed Ohio's sanity standard at the time of the murders. After Markey made the same concession before the jury, the court granted the prosecution's renewed motion to exclude Markey's testimony and instructed the jury to disregard the testimony that it heard. And the court excluded the defense's proffered reports from other psychologists and psychiatrists who examined Spisak, because none of the reports said that Spisak met

the Ohio insanity standard at the time of the crimes. *Id.*, at 1898–1899, 1911–1912, 1995; *id.*, at 2017, 2022 (July 12, 1983).

During the sentencing phase of the proceedings, defense counsel called three expert witnesses, all of whom testified that Spisak suffered from some degree of mental illness. Dr. Sandra McPherson, a clinical psychologist, said that Spisak suffered from schizotypal and borderline personality disorders characterized by bizarre and paranoid thinking, gender identification conflict, and emotional instability. She added that these defects "substantially impair his ability to conform himself" to the law's requirements. 8 *id.*, at 2428–2429, 2430–2441 (July 16, 1983). Dr. Kurt Bertschinger, a psychiatrist, testified that Spisak suffered from a schizotypal personality disorder and that "mental illness does impair his reason to the extent that he has substantial inability to know wrongfulness, or substantial inability to refrain." *Id.*, at 2552–2556. Dr. Markey, whose testimony had been stricken at the guilt phase, again testified and agreed with the other experts' diagnoses. *Id.*, at 2692–2693, 2712–2713 (July 18, 1983).

In light of this background and for the following reasons, we do not find that the assumed deficiencies in defense counsel's closing argument raise "a reasonable probability that," but for the deficient closing, "the result of the proceeding would have been different." *Strickland*, 466 U. S., at 694. We therefore cannot find the Ohio Supreme Court's decision rejecting Spisak's ineffective-assistance-of-counsel claim to be an "unreasonable application" of the law "clearly established" in *Strickland*. §2254(d)(1).

First, since the sentencing phase took place immediately following the conclusion of the guilt phase, the jurors had fresh in their minds the government's evidence regarding the killings—which included photographs of the dead bodies, images that formed the basis of defense counsel's

vivid descriptions of the crimes—as well as Spisak's boastful and unrepentant confessions and his threats to commit further acts of violence. We therefore do not see how a less descriptive closing argument with fewer disparaging comments about Spisak could have made a significant difference.

Similarly fresh in the jurors' minds was the three defense experts' testimony that Spisak suffered from mental illness. The jury had heard the experts explain the specific facts upon which they had based their conclusions, as well as what they had learned of his family background and his struggles with gender identity. And the jury had heard the experts draw connections between his mental illness and the crimes. We do not see how it could have made a significant difference had counsel gone beyond his actual argument—which emphasized mental illness as a mitigating factor and referred the jury to the experts' testimony—by repeating the facts or connections that the experts had just described.

Nor does Spisak tell us what other mitigating factors counsel might have mentioned. All those he proposes essentially consist of aspects of the "mental defect" factor that the defense experts described.

Finally, in light of counsel's several appeals to the jurors' sense of humanity—he used the words "humane people" and "humane society" 10 times at various points in the argument—we cannot find that a more explicit or more elaborate appeal for mercy could have changed the result, either alone or together with the other circumstances just discussed. Thus, we conclude that there is not a reasonable probability that a more adequate closing argument would have changed the result, and that the Ohio Supreme Court's rejection of Spisak's claim was not "contrary to, or . . . an unreasonable application of" *Strickland*. 28 U. S. C. §2254(d)(1).

Spisak contends that the deferential standard of review

under §2254(d)(1) should not apply to this claim because the Ohio Supreme Court may not have reached the question whether counsel's closing argument caused Spisak prejudice.  That is, the Ohio Supreme Court's summary rejection of this claim did not indicate whether that court rested its conclusion upon a finding (1) that counsel was not ineffective, or (2) that a better argument would not have made a difference, or (3) both.  See *State* v. *Spisak*, 36 Ohio St. 3d, at 82, 521 N. E. 2d, at 802.  Spisak argues that, under these circumstances, a federal court should not defer to a state court that may not have decided a question, but instead should decide the matter afresh.  Lower federal courts have rejected arguments similar to Spisak's.  See, *e.g., Hennon* v. *Cooper*, 109 F. 3d 330, 334–335 (CA7 1997); see also *Weeks* v. *Angelone*, 528 U. S. 225, 231, 237 (2000) (applying the §2254(d) standard in case involving a state court's summary denial of a claim, though not a *Strickland* claim, and without full briefing regarding whether or how §2254(d) applied to a summary decision); *Chadwick* v. *Janecka*, 312 F. 3d 597, 605–606 (CA3 2002) (Alito, J.) (relying on *Weeks* in holding that §2254(d) applies where a state court denies a claim on the merits without giving any indication how it reached its decision); see generally 2 R. Hertz & J. Liebman, Federal Habeas Corpus Practice and Procedure §32.2, pp. 1574–1579 (5th ed. 2005 and 2008 Supp.).  However, we need not decide whether deference under §2254(d)(1) is required here.  With or without such deference, our conclusion is the same.

For these reasons, the judgment of the Court of Appeals for the Sixth Circuit is reversed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 08–724

KEITH SMITH, WARDEN, PETITIONER *v.* FRANK G. SPISAK, JR.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[January 12, 2010]

JUSTICE STEVENS, concurring in part and concurring in the judgment.

In my judgment the Court of Appeals correctly concluded that two errors that occurred during Spisak's trial violated clearly established federal law. First, the jury instructions impermissibly required that the jury unanimously reject a death sentence before considering other sentencing options. Second, the closing argument of Spisak's counsel was so egregious that it was constitutionally deficient under any standard. Nevertheless, for the reasons set forth in Part III of the Court's opinion, *ante*, at 11–15, I agree that these errors did not prejudice Spisak and thus he is not entitled to relief.

## I

The jury instructions given during Spisak's penalty phase, described in the Court's opinion, *ante*, at 6–8, are fairly read to require the jury first to consider whether the death penalty is warranted—*i.e.*, whether the aggravating factors outweigh the mitigating factors—before moving on to consider whether instead a lesser penalty—*i.e.*, one of two available life sentences—is appropriate. Consistent with Ohio law at the time of Spisak's trial,[1] the jury was

_____

[1] Ohio no longer uses the type of jury instructions at issue in this case. In 1996 the Ohio Supreme Court instructed that "[i]n Ohio, a

told that it must reach its decision unanimously. The jury was not instructed on the consequence of their failure to agree unanimously that Spisak should be sentenced to death. Spisak and the Court of Appeals both described these instructions as "acquittal first" because they would have led a reasonable jury to believe that it first had to "acquit" the defendant of death—unanimously—before it could give effect to a lesser penalty.

Following its prior decision in *Davis* v. *Mitchell*, 318 F. 3d 682 (CA6 2003), in which it struck down "virtually identical" jury instructions, *Spisak* v. *Mitchell,* 465 F. 3d 684, 710 (CA6 2006), the Court of Appeals concluded that the instructions given during Spisak's penalty phase were impermissible because they "require[d] the jury to unanimously reject a death sentence before considering other sentencing alternatives," *id.*, at 709. In *Davis*, the court had explained that an instruction that requires a capital jury to "first unanimously reject the death penalty before it can consider a life sentence . . . precludes the individual jury from giving effect to mitigating evidence . . . ." 318 F. 3d, at 689. The source of this constitutional infirmity, the court decided, was our decision in *Mills* v. *Maryland*,

—————

solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors from this point forward should be so instructed." *State* v. *Brooks*, 75 Ohio St. 3d 148, 162, 661 N. E. 2d 1030, 1042. Although the *Brooks* decision signaled a change in Ohio's capital jury instructions, it was not a change in state law: One juror had the power to prevent a death penalty recommendation before *Brooks*. See *State* v. *Springer*, 63 Ohio St. 3d 167, 172, 586 N. E. 2d 96, 100 (1992) (holding that an offender must be sentenced to life if the penalty-phase jury deadlocks). Thus, consistent with our view that "accurate sentencing information is an indispensable prerequisite to a [jury's] determination of whether a defendant shall live or die," *Gregg* v. *Georgia*, 428 U. S. 153, 190 (1976) (joint opinion of Stewart, Powell, and STEVENS, JJ.), the Ohio high court laudably improved upon the accuracy of Ohio capital jury instructions in *Brooks*.

486 U. S. 367 (1988). For the reasons cogently examined in JUSTICE BREYER's opinion, *ante*, at 5–9, I agree that *Mills* does not clearly establish that the instructions at issue were unconstitutional. But, in my view, our decision in *Beck* v. *Alabama*, 447 U. S. 625 (1980), does.[2]

In *Beck* we held that the death penalty may not be imposed "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Id.,* at 627 (internal quotation marks omitted). At that time, the Alabama death penalty statute had been "consistently construed to preclude any lesser included offense instructions in capital cases." *Id.*, at 629, n. 3. Thus, the Alabama jury was "given the choice of either convicting the defendant of the capital crime, in which case it [was] required to impose the death penalty, or acquitting him, thus allowing him to escape all penalties for his alleged participation in the crime." *Id.*, at 628–629. Because of the unique features of Alabama's capital punishment system,[3] Beck's jury believed that either it had to convict Beck, thus sending him to his death, or acquit him, thus setting him free. The jury was not presented with the "third option" of convicting him of a noncapital offense, thus ensuring that he would receive a substantial punishment but not receive the death penalty. *Id.*, at 642. We concluded that the false choice before the jury—death

——————

[2] Notably, *Beck* substantially predates Spisak's trial and thus my application of *Beck* obviates any discussion on when federal law is established for Antiterrorism and Effective Death Penalty Act of 1996 purposes, see *ante*, at 3. Regardless, in accordance with the view I expressed in *Williams* v. *Taylor*, 529 U. S. 362, 379–380 (2000) (opinion of STEVENS, J.), I would conclude that our decision in *Mills*, decided before Spisak's conviction became final, is also available to him.

[3] Under Alabama law, the judge conducts a separate penalty-phase proceeding after the jury has returned a conviction on a capital offense. *Beck*, 447 U. S., at 629. Thus, the jury reasonably believed that its verdict would set the defendant's punishment at death.

or acquit—"introduce[d] a level of uncertainty and unreli-
ability into the factfinding process that cannot be tolerated
in a capital case." *Id.*, at 643. In other words,

> "the difficulty with the Alabama statute is that it in-
> terjects irrelevant considerations into the factfinding
> process, diverting the jury's attention from the central
> issue of whether the State has satisfied its burden of
> proving beyond a reasonable doubt that the defendant
> is guilty of a capital crime. Thus, on the one hand, the
> unavailability of the third option of convicting on a
> lesser included offense may encourage the jury to con-
> vict for an impermissible reason—its belief that the
> defendant is guilty of some serious crime and should
> be punished. On the other hand, the apparently
> mandatory nature of the death penalty may encour-
> age it to acquit for an equally impermissible reason—
> that, whatever his crime, the defendant does not de-
> serve death." *Id.*, at 642–643.

Although *Beck* dealt with guilt-phase instructions, the
reach of its holding is not so limited. The "third option" we
discussed in *Beck* was, plainly, a life sentence. Moreover,
the unusual features of the Alabama capital sentencing
scheme collapsed the guilt and penalty phases before the
jury (but not before the judge). Our concern in *Beck* was
that presenting the jury with only two options—death or
no punishment—introduced a risk of arbitrariness and
error into the deliberative process that the Constitution
could not abide in the capital context. See *Spaziano* v.
*Florida*, 468 U. S. 447, 455 (1984) ("The goal of the *Beck*
rule, in other words, is to eliminate the distortion of the
factfinding process that is created when the jury is forced
into an all-or-nothing choice between capital murder and
innocence"). We held, therefore, that the jury must be
given a meaningful opportunity to consider and embrace
the equivalent of a life-sentence when the evidence sup-

ports such an option.

The acquittal-first jury instructions used during Spisak's penalty phase interposed before the jury the same false choice that our holding in *Beck* prohibits. By requiring Spisak's jury to decide first whether the State had met its burden with respect to the death sentence, and to reach that decision unanimously, the instructions deprived the jury of a meaningful opportunity to consider the third option that was before it, namely, a life sentence. Indeed, these instructions are every bit as pernicious as those at issue in *Beck* because they would have led individual jurors (falsely) to believe that their failure to agree might have resulted in a new trial and that, in any event, they could not give effect to their determination that a life sentence was appropriate unless and until they had first convinced each of their peers on the jury to reject the death sentence.

Admittedly, Spisak has never identified *Beck* as the source of the constitutional infirmity at issue in this case, nor did the courts below cite or rely upon it. But Spisak has consistently pressed his argument in terms that are wholly consistent with *Beck*. On direct appeal he contended, for example, that he:

> "was severely prejudiced by the erroneous jury forms because the jurors were never informed of what would happen if they were unable to reach a unanimous decision. That may have led to irreparable speculation that if they failed to agree, Frank Spisak would be freed or have a new trial or sentencing hearing. Such improper speculation may have led those not in agreement with death to go along with a majority. The jury should have been instructed that if they were unable to unanimously agree to death they must return a verdict of one of the life sentences or in the alternative, the court would impose a life sentence."

Exh. 28D, 16 Record 391 (Brief for Supreme Court of Ohio).

The untenable choice Spisak describes is perfectly analogous to the quandary, discussed above, that we described in *Beck*. See also 447 U. S., at 644 ("It is extremely doubtful that juries will understand the full implications of a mistrial or will have any confidence that their choice of the mistrial option will ultimately lead to the right result. Thus, they could have no assurance that a second trial would end in the conviction of the defendant on a lesser included offense" (footnote omitted)). Spisak and the Court of Appeals both correctly assailed the jury instructions at issue in this case, but in my view *Beck* provides the proper basis in clearly established federal law to conclude the instructions were unconstitutional.

## II

Petitioner defends Spisak's counsel's closing argument as a reasonable strategic decision "to draw the sting out of the prosecution's argument and gain credibility with the jury by conceding the weaknesses of his own case." Brief for Petitioner 37. I agree that such a strategy is generally a reasonable one and, indeed, was a reasonable strategy under the difficult circumstances of this case. Even Spisak concedes that his counsel "faced an admittedly difficult case in closing argument in the penalty phase." Brief for Respondent 43. But, surely, a strategy can be executed so poorly as to render even the most reasonable of trial tactics constitutionally deficient under *Strickland* v. *Washington*, 466 U. S. 668 (1984). And this is such a case.

It is difficult to convey how thoroughly egregious counsel's closing argument was without reproducing it in its entirety. The Court's assessment of the closing as "lengthy and rambling" and its brief description of its content, see *ante*, at 10, does not accurately capture the

catastrophe of counsel's failed strategy. Suffice it to say that the argument shares far more in common with a prosecutor's closing than with a criminal defense attorney's. Indeed, the argument was so outrageous that it would have rightly subjected a prosecutor to charges of misconduct. See Brief for Steven Lubet et al. as *Amici Curiae* 15–16 (observing that counsel's closing argument "would have been improper even coming from the *prosecutor*"). A few examples are in order.

Presumably to take the "sting" out of the prosecution's case, Brief for Petitioner 37, counsel described his client's acts in vivid detail to the jury:

> "[Y]ou can smell almost the blood. You can smell, if you will, the urine. You are in a bathroom, and it is death, and you can smell the death . . . and you can feel, the loneliness of that railroad platform . . . and we can all know the terror that [the victim] felt when he turned and looked into those thick glasses and looked into the muzzle of a gun that kept spitting out bullets . . . And we can see a relatively young man cut down with so many years to live, and we could remember his widow, and we certainly can remember looking at his children . . . There are too many family albums. There are too many family portraits dated 1982 that have too many empty spaces. And there is too much terror left in the hearts of those that we call lucky."[4]  465 F. 3d, at 704–795 (internal quotation

---

[4] To make matters worse, these graphic and emotionally charged descriptions of Spisak's crimes were irrelevant under state law even for purposes of the State's case for aggravating circumstances. See *State* v. *Wogenstahl*, 75 Ohio St. 3d 344, 356, 662 N. E. 2d 311, 322 (1996) ("[T]he nature and circumstances of the offense may only enter into the statutory weighing process on the side of *mitigation*"); see also *State* v. *Johnson*, 24 Ohio St. 3d 87, 93, 494 N. E. 2d 1061, 1066 (1986) (explaining that statutory aggravating circumstances should be narrowly construed); Ohio Rev. Code Ann. §2929.04(A) (2006) (identifying 10

marks omitted).

Presumably to "gain credibility" with the jury, Brief of Petitioner 37, counsel argued that his client deserved no sympathy for his actions:

> "Sympathy, of course, is not part of your consideration. And even if it was, certainly, don't look to him for sympathy, because he demands none. And, ladies and gentlemen, when you turn and look at Frank Spisak, don't look for good deeds, because he has done none. Don't look for good thoughts, because he has none. He is sick, he is twisted. He is demented, and he is never going to be any different."  465 F. 3d, at 705 (internal quotation marks omitted).

And then the strategy really broke down: At no point did counsel endeavor to direct his negative statements about his client toward an express appeal for leniency.[5] On the contrary, counsel concluded by telling the jury that "whatever you do, we are going to be proud of you," *ibid.* (internal quotation marks omitted), which I take to mean that, in counsel's view, "either outcome, death or life, would be a valid conclusion," *ibid.*

Spisak's crimes, and the seemingly unmitigated hatred motivating their commission, were truly awful. But that does not excuse a lawyer's duty to represent his client within the bounds of prevailing professional norms. The mere fact that counsel, laudably, may have had a "strategy" to build rapport with the jury and lessen the impact of the prosecution's case, does not excuse counsel's utter

---

aggravating circumstances but not including heinous circumstances of offense).

[5] Counsel did attempt to appeal to the jury's sense of humanity, perhaps implicitly suggesting that humane people do not condemn others, especially those with mental illness, to death. App. to Pet. for Cert. 339a–341a. But counsel never requested a life sentence on behalf of his client.

failure to achieve either of these objectives through his closing argument. In short, counsel's argument grossly transgressed the bounds of what constitutionally competent counsel would have done in a similar situation.

### III

Notwithstanding these two serious constitutional errors, I agree with the Court that these errors do not entitle Spisak to relief. As JUSTICE BREYER's discussion in Part III makes vividly clear, see *ante*, at 11–14, Spisak's own conduct alienated and ostracized the jury, and his crimes were monstrous. In my judgment even the most skillful of closing arguments—even one befitting Clarence Darrow—would not have created a reasonable probability of a different outcome in this case. Similarly, in light of Spisak's conduct before the jury and the gravity of the aggravating circumstances of the offense, the instructional error was also harmless because it did not have a substantial and injurious effect on this record, *Brecht* v. *Abrahamson,* 507 U. S. 619, 623 (1993).

Accordingly, I concur in the judgment and concur in the Court's discussion of prejudice in Part III of its opinion.